Pierce Ryan, Appellant, v. The City of New York, Respondent.

1. Constitutional Law — Provision of Labor Law as to Prevailing Rate of Wages, so Far as It Relates to State or Municipal Employees, Constitutional. Section 3 of the Labor Law (L. 1897, ch. 415, amd. L. 1899, ch. 567), providing that "The wages to be paid for a legal day's work * * * to all classes of such laborers, workmen or mechanics upon all such public work or upon any material to be used upon or in connection therewith shall not be less than the prevailing rate for a day's work in the same trade or occupation in the locality within the state where such public work on, about or in connection with which such labor is performed in its final or completed form is to be situated, erected or used," so far as it relates to the direct employees of the state or of a municipality thereof, is constitutional.

2. Waiver of Claim under the Statute by Municipal Employee to Increased Compensation. An employee of a municipality, who, prior to the enactment of the Labor Law, had been employed as a laborer at a specified sum per day and who thereafter became entitled to receive a greater sum per day at the prevailing rate of wages in the locality, and who, without demanding the same, continues without protest to accept the wages at the former rate for a period of six years, thereby waives any claim he may have had under the statute to recover the per diem increase for that period.

*Ryan* v. *City of New York*, 78 App. Div. 134, affirmed.

(Argued November 12, 1903; decided January 29, 1904.)

Appeal from a judgment of the Appellate Division of the Supreme Court in the first judicial department, entered January 22, 1903, which affirmed a judgment in favor of defendant entered upon a dismissal of the complaint by the court on trial at Special Term.

The nature of the action and the facts, so far as material, are stated in the opinions.

*David B. Hill, Carlos C. Alden* and *Ingle Carpenter* for appellant. The statute to the extent invoked herein is constitutional. (*McAvoy* v. *City of New York*, 52 App. Div. 485; *McCann* v. *City of New York*, 52 App. Div. 358; *McCunney* v. *City of New York*, 40 App. Div. 482; *McMahon* v. *Mayor, etc.*, 22 App. Div. 113; *C. C. T. Co.* v.

*K. R. R. Co.*, 154 N. Y. 495; *N. H. Co.* v. *Bement*, 163 N. Y. 522; *People ex rel.* v. *Tax Comrs.*, 174 N. Y. 419; *Bristor* v. *Smith*, 158 N. Y. 157; *I. T. B. Co.* v. *Weisinger*, 65 N. E. Rep. 521.)

*George L. Rives, Corporation Counsel* (*Edward J. McGuire* of counsel), for respondent. Section 3 of the Labor Law is unconstitutional. (*People ex rel.* v. *Coler*, 166 N. Y. 1; *McAvoy* v. *City of New York*, 52 App. Div. 485; 166 N. Y. 588; *People ex rel.* v. *Coler*, 166 N. Y. 149; *People ex rel.* v. *Coler*, 168 N. Y. 8; *People ex rel.* v. *Featherston-haugh*, 172 N. Y. 112; *People* v. *O. C. R. C. Co.*, 175 N. Y. 84.) The legislature cannot fix an arbitrary price which municipal corporations shall pay laborers. (*People ex rel.* v. *Coler*, 166 N. Y. 1; *City of Cleveland* v. *C. B. C. Co.*, 67 Ohio St. 197; *Street* v. *V. E. S. Co.*, 66 N. E. Rep. 895.)

PARKER, Ch. J. There are two questions presented by this review. The first is, Has the legislature power to provide that its employees and those of the several municipalities shall receive "not less than the prevailing rate" of wages in the locality? In other words, has the legislature — which possesses all the power of the sovereign not expressly withheld by the Constitution — power to provide that work done for it or its several subdivisions shall be paid for at such a rate as individuals and corporations in the same locality pay?

That question was before this court some years ago in so far as it affects the right of the legislature to fix the rate of wages of laborers upon the works of the state. (*Clark* v. *State of New York*, 142 N. Y. 101.) In 1889 the legislature passed an act (L. 1889, ch. 380) providing that the rate of wages upon the public works of the state should be $2 a day. That was more than the then prevailing rate, and there were those who questioned the power of the state to interfere with its agents in fixing the wages of men working under them. They thought the superintendent of public works had the sole power of fixing wages of employees in that department, and, therefore, could defy the direction of the legisla-

ture as to the amount of compensation to be paid, although he could disburse such moneys only as were appropriated by the legislature. And they entreated the attorney-general to commence an action to have the court declare the impotency of the legislature to interfere on the important subject of compensation to laborers. But when the case reached this court in 1894 the attorney-general was unable to point to the provision of the Constitution which divested the representatives of the People for all matters of legislation of this power, and vested it in the several inferior officials having charge of certain administrative duties conferred upon them in the majority of instances by acts of the same legislature. The court — unaffected, as was its duty, by the argument that the statute was unwise and mindful that its duty was discharged fully and could only be discharged by declaring whether the legislature had the power to enact the statute complained of — unanimously held that the power belonged to it. Judge O'BRIEN, writing for the unanimous court, says (142 N. Y. 101, 105): "There is no express or implied restriction to be found in the Constitution upon the power of the legislature to fix and declare the rate of compensation to be paid for labor or services performed upon the public works of the state."

The principle of that decision controls this one. There the legislature undertakes to fix arbitrarily the sum to be paid to every employee of the state. Here the legislature undertakes to provide for the payment of not less than the prevailing rate of wages, not only to the direct employees of the state, but also to its indirect employees working in its several subdivisions — the cities, counties, towns and villages. In the administration of the affairs of those subdivisions, as well as in those of the state at large, the legislature is unrestrained unless by express provisions of the Constitution. As expressed in *Rodgers' Case* (166 N. Y. 1, 29): "The authority of the state is supreme in every part of it and in all of the public undertakings the state is the proprietor. For convenience of local administration the state has been divided into municipalities,

18

in each of which there may be found local officers exercising
a certain measure of authority, but in that which they do they
are but the agents of the state, without power to do a single
act beyond the boundary set by the state acting through its
legislature." Thus all of these agencies and employees in the
several municipalities are doing the work of the state, which
is the sovereign and master.

Nevertheless, we find that the argument is again made, as
in 1894 in *Clark's* case, that the legislature is without power
to interfere with the agencies it has created for the govern-
ment of the municipalities. And this is said in the face of
the decision in *Clark's* case, and notwithstanding the fact
that the legislature has the power at any time to absolutely
change the form of government of a municipality, to blot out
of existence any municipal charter, or to consolidate several
municipalities under a single charter, as it did in the creation
of Greater New York. And this argument is made in spite
of the many well-known illustrations of the power of the legis-
lature to control the affairs of municipalities. The scope of
that power is illustrated by the construction of the new aque-
duct by a board created by the legislature, the expense being
charged upon the city of New York, although not a single
officer of the city had a voice in controlling the expenditure
of the millions that its construction involved; and by the act
compelling the elevation of the Harlem railroad tracks in the
city of New York, and the imposition of one-half of the
expense, amounting to several millions, upon the city of New
York, the work all being done through an agency created by
the state.

Not only does the legislature fix the salaries of the principal
municipal officers throughout the state, but in the city of
New York, where this case arises, it fixes the rate of com-
pensation for many laborers. The street cleaning depart-
ment will serve as an illustration. The charter provides for
the payment of definite sums in some cases, and for a maxi-
mum sum in others, for a force numbering over 5,000
employees in that department, and including 3,100 sweepers

and 1,600 drivers, hostlers and stable foremen. The charter
in this respect has the support of *Clark's Case* (*supra*). Now
there are a few mechanics connected with the department
whose compensation is not fixed by the charter, and who,
therefore, come under the prevailing rate provision of the
Labor Law. Their compensation could be fixed of course at a
definite sum as that of the other employees is, but instead it is
provided in effect that they shall be paid at a rate not less
than that paid by others for similar services in that locality.
Certainly no one can argue that the legislature can provide
that the street sweeper shall be paid — for example — $2 a
day, but cannot provide that he shall be paid the prevailing
rate of wages when that happens to be $2. But if one can be
found who will attempt to make such an argument surely it
can be safely said that he cannot find a constitutional provision
upon which to rest it.

Since the foregoing was written the opinion of the United
States Supreme Court in *Atkin* v. *State of Kansas* (191 U.
S. 207) has been brought to our attention. It is in point and
decides the question in accordance with the views we have
already expressed. A Kansas statute provides that "Eight
hours shall constitute a day's work for all laborers, workmen,
mechanics or other persons now employed, or who may here-
after be employed by or on behalf of the state of Kansas,
*or by or on behalf of any county, city, township or other
municipality of said state.* \* \* \* Not less than the
current rate of per diem wages in the locality where the
work is performed shall be paid to laborers, workmen,
mechanics and other persons employed by or on behalf
of the state of Kansas, or any county, city, township or
other municipality of said state. \* \* \* All contracts
hereafter made by or on behalf of the state of Kansas,
or by or on behalf of any county, city, township or other
municipality of said state, with any corporation, person or per-
sons, for the performance of any work or the furnishing of
any material manufactured within the state of Kansas, shall
be deemed and considered as made upon the basis of eight

hours constituting a day's work." A violation of the statute
is a misdemeanor. Atkin made a contract with a municipal-
ity — Kansas City — to pave a street. He was convicted
under the statute, and the conviction affirmed by the Kansas
Supreme Court. It was argued before the United States
Supreme Court that the statute violates the 14th amendment
in that it deprives the contractor of his liberty and property
without due process of law, and denies him the equal protec-
tion of the laws. The court holds that the statute does not
violate the 14th amendment, and in the course of the opinion,
written by Mr. Justice HARLAN, says: " ' If a statute,' coun-
sel observes, ' such as the one under consideration, is justifi-
able, should it not apply to all persons and to all vocations
whatsoever? Why should such a law be limited to contract-
ors with the state and its municipalities?  *  *  *  Why
should the law allow a contractor to agree with a laborer to
shovel dirt for ten hours a day in performance of a private
contract, and make exactly the same act under similar condi-
tions a misdemeanor when done in performance of a contract
for the construction of a public improvement? Why is lib-
erty with reference to contracting restricted in one case and
not in the other?'

" These questions — indeed, the entire argument of defend-
ant's counsel — seem to attach too little consequence to the
relation existing between a state and its municipal corporations.
Such corporations are the creatures, mere political subdivisions,
of the state for the purpose of exercising a part of its powers.
They may exert only such powers as are expressly granted to
them, or such as may be necessarily implied from those granted.
What they lawfully do of a public character is done under the
sanction of the state. They are, in every essential sense, only
auxiliaries of the state for the purposes of local government.
They may be created, or, having been created, their powers
may be restricted or enlarged, or altogether withdrawn, at the
will of the legislature; the authority of the legislature, when
restricting or withdrawing such powers, being subject only to
the fundamental condition that the collective and individual

rights of the people of the municipality shall not thereby be destroyed. [Citing several cases, the last being *Williams* v. *Eggleston*, 170 U. S. 304, 310.] In the case last cited we said that ' a municipal corporation is, so far as its purely municipal relations are concerned, simply an agency of the state for conducting the affairs of government, and as such it is subject to the control of the legislature.'" The court quotes with approval from the opinion in *City of Clinton* v. *Cedar Rapids & Missouri River R. R. Co.* (24 Iowa, 455, 475) : "Municipal corporations owe their origin to, and derive their powers and rights wholly from, the legislature. It breathes into them the breath of life, without which they cannot exist. As it creates, so it may destroy. If it may destroy, it may abridge and control. Unless there is some constitutional limitation on the right, the legislature might, by a single act, if we can suppose it capable of so great a folly and so great a wrong, sweep from existence all of the municipal corporations in the state, and the corporation could not prevent it. We know of no limitation upon this right, so far as the corporations themselves are concerned. They are, so to phrase it, the mere tenants at will of the legislature." After referring to the possible motive of the legislature in making the statute, the court continued : "We have no occasion here to consider these questions, or to determine upon which side is the sounder reason ; for, whatever may have been the motives controlling the enactment of the statute in question, *we can imagine no possible ground* to dispute the power of the state to declare that no one undertaking work *for it or for one of its municipal agencies* should permit or require an employee on such work to labor in excess of eight hours each day, and to inflict punishment upon those who are embraced by such regulations and yet disregard them. It cannot be deemed a part, of the liberty of any contractor that *he* be allowed to do public work in any mode he may choose to adopt, without regard to the wishes of the state. On the contrary, it belongs to the state, as guardian and trustee for its people, and having control of its affairs, to prescribe the con·

ditions upon which it will permit public work to be done *on
its behalf, or on behalf of its municipalities. No court has
authority to review its action in that respect.* Regulations
upon this subject suggest only considerations of public policy.
And with such considerations the courts have no concern."

The case under consideration is not controlled by *Rodgers'
Case* (166 N. Y. 1). The decision in that case is that so much
of the statute as in effect requires a contractor for municipal
work to agree that he will pay his workmen not less than the
prevailing rate of wages, and makes the contract void if he
fails to pay at such rate, at least, is unconstitutional. It is
said by the court in support of that decision that the statute
invades rights of liberty and property in that it denies to the
contractor the right to agree with employees as to the rate of
compensation, and imposes a penalty upon the right of the
contractor to agree with employees upon terms of employ-
ment. It is true that in one of the prevailing opinions argu-
ment sufficiently broad to cover this case is made, but it is not
necessary for the decision, and is obiter, and, therefore, need
not be followed. Our conclusion is that so much of the stat-
ute as is involved in this case is constitutional.

The second-question presented by the record is: Did the
plaintiff waive his right to insist that his compensation should
be at the prevailing rate of wages for rammers in the city of
New York? Section 3 of the Labor Law does not attempt
to fix in dollars and cents the wages to be paid to those
employed on state or municipal work, but provides that such
wages " shall not be less than the prevailing rate for a day's
work in the same trade or occupation in the locality." The
statute, therefore, made it the duty of the person charged
with employing plaintiff to ascertain the prevailing rate of
wages for similar services in the city, and then to fix the com-
pensation at that amount, or a still greater one, and by the
section following the legislature undertook to assure such
action by the officials commanded to fix wages at *not less* than
the prevailing rate by providing that an official violating the
provisions of the act would be guilty of malfeasance in office,
and be suspended or removed.

We must assume — in view of the fact that the question arises from a demurrer to the complaint — that all of its allegations are true, and that the officer employing the plaintiff did not obey the statute, and hence became subject to its penalties. But that fact in nowise aids the plaintiff in his present contention. He had been in the employ of the city for some time prior to May 10th, 1894 — when the statute went into operation — at the rate of $3 a day, and that sum the city continued to pay, and he to receive without protest, for a period of six years. The prevailing rate of wages for that period was $3.50 a day, and the employing officer should have fixed plaintiff's wages at that sum or greater. But he did not do it, and while the plaintiff could have properly insisted that the officer should heed the command of the statute in that respect, he chose instead to continue in the service of the city without objecting to the compensation.

Now, "it is well settled by authority that a man may waive any right that he has, whether secured to him by contract, conferred on him by statute or guaranteed him by the Constitution." (*People ex rel. McLaughlin* v. *Bd. Police Comrs.*, 174 N. Y. 450, 456, and cases cited.) And the legal effect of plaintiff's action in accepting from time to time during a period of six years, without protest, the wages paid to him by the city, was to waive any claim that he might have had at the time to insist that the employing officer should fix his rate of compensation at a greater sum than he did.

It follows that plaintiff is not entitled to recover.

The judgment should be affirmed, with costs.

O'BRIEN, J. This was an action to recover arrears of wages claimed by the plaintiff to be due to him. The plaintiff alleges in his complaint that the defendant is indebted to him in the sum of six hundred dollars for arrears of pay as a laborer on the streets at the rate of fifty cents per day for each work day that he was employed by the defendant during a period of about six years and paid at the rate of three dollars per day. In substance, his claim is that, during all this time,

he was not paid enough and if the city had obeyed that provision of the Labor Law requiring it to pay "the prevailing rate of wages" he would have received three dollars and fifty cents per day.

The defendant demurred to the complaint on the ground that it did not state facts sufficient to constitute a cause of action. The courts below sustained the demurrer and the plaintiff has appealed to this court from the judgment. The complaint alleges that, prior to the enactment of the Labor Law on May 10th, 1894, the plaintiff had been in the employ of the city as a laborer on the streets and was paid therefor at the rate of three dollars per day, but claims no arrears of pay on account of such services. It is then alleged that the Labor Law was enacted on May 10th, 1894. (Chap. 622, Laws of 1894), and that the plaintiff from that date became entitled to receive wages at the prevailing rate, and that such rate, upon the law taking effect, became three dollars and fifty cents per day. It is then stated that, after the law went into effect, the plaintiff continued to work in the same capacity by the day during about six years, to the first of January, 1900, working in all twelve hundred days and was paid therefor at the rate of three dollars for every day, or three thousand six hundred dollars in all, whereas if the prevailing rate of wages law had been observed he would have received four thousand two hundred dollars. The difference between these two amounts is the sum for which judgment is demanded.

It appears, therefore, from the face of the complaint that the plaintiff worked for the defendant before the law took effect and for six years after, receiving the same wages after the law as before. The course of dealing between the parties during such a long period of time, in the absence of some allegation of fraud, mistake, or of a right expressly reserved, justifies the legal inference that there was a contract between the parties, expressed or to be implied, that the plaintiff was to receive for his work three dollars per day and no more, or that he has waived all claim under the statute. When a

servant sues the master for wages, alleging that he worked
by the day for more than six years, and was paid for each
day's work at the rate of three dollars per day, and makes no
claim or allegation that he ever asked any more, or ever
objected on the ground that he had not been paid enough, or
that he reserved the right to demand more in the future, or
that there was fraud or mistake in the dealings, the legal con-
clusion from the facts must be that there was a full settlement
between the parties or an agreement as to the rate of wages,
or a waiver of any other claim. (*McCarthy* v. *Mayor, etc., of
N. Y.*, 96 N. Y. 1.)   I understand that there is no difference
of opinion in this court on this point, and, if not, then the case
is decided and it is not necessary to discuss the validity of the
Labor Law.   That question, as I think, is no longer open in
this court.   (*People ex rel. Rodgers* v. *Coler*, 166 N. Y. 1;
*People ex rel. Treat* v. *Coler*, Id. 149 ; *People ex rel.
Lentilhon* v. *Coler*, 168 N. Y. 8 ; *People ex rel. North*
v. *Featherstonhaugh*, 172 N. Y. 112 ; *People* v. *Orange
Co. R. C. Co.*, 175 N. Y. 84.)   It is, however, supposed
to be necessary or useful to reopen that controversy and to
make a fanciful distinction between the decisions already
made and the case at bar.   There can be no sound distinction
in the application of the statute to the direct and immediate
employees of a city and the case of an independent contractor
who has not observed the law.   The contention that in the
former case the law may be held good though it may be void
as to the latter is not based upon any sound reason and is in
conflict with the authorities cited.   The defendant's charter
provides that certain public work, involving the expenditure
of money beyond a certain designated amount, must be done
by contractors whose bid for the work is the lowest or most
favorable to the city, and as to work below this amount it
may be done by the city itself directly through its own
employees.   We have certainly held that, as to the former
class of work, the statute with respect to " the prevailing rate
of wages" is void, although in that case the city inserted " the
prevailing rate of wages " clause in the contract.   It is now

earnestly contended that there is a distinction to be observed with respect to the validity of the law when applied to the same class of laborers working for a contractor and those working for the city. That as to the former the law is in conflict with the Constitution, while as to the latter it is perfectly valid. Just how the law can bind the city and not bind the contractor is difficult to conceive, since the latter is an instrument of the former in carrying out the purpose of its incorporation. The contractor has no standing to question a valid law under which the city acted when entering into a contract with him. I will only add that, to my mind, there is something preposterous in the proposition that this statute cannot, as we have held, bind a contractor digging a sewer on one side of a street while it can and does bind the city superintendent of streets repairing a pavement on the other side. But if the question was a new one there is, I think, but little difficulty in its proper solution. The question, in its last analysis, is a very simple one, and that is whether a mandatory statute which requires a city to pay to its employees a fixed sum as compensation for their work or as wages is a constitutional exercise of legislative power.

There can be no distinction in this respect between a statute which fixes the wages of servants directly in dollars and cents at so much per day or so much per hour and a statute which fixes minimum wages by some known or ascertainable rule or standard. The statute requiring the defendant in this case to pay to its workmen a sum described as "the prevailing rate of wages" is, under the circumstances of the case, just as objectionable as if it specified the sum to be paid, since in the one case as well as in the other the city is deprived of the right to make contracts with its employees, fixing the rate of wages, and of all discretion with respect to the same. Considering the power of the legislature over this subject, the question is not always what has been done but what may be done, if the power claimed be conceded. If, in this case, the statute had fixed the plaintiff's wages at five dollars per day there could be no objection made to the law that cannot be

made now.   If the statute in that case would be bad then the law in its present form is open to the same objection.   We learn from the complaint in this case the important fact that just as soon as the statute went into operation "the prevailing rate of wages" instantly rose over fifteen per cent, which is an object lesson throwing much light upon the nature of the power assumed in the passage of the law.   It simply means that the legislature has the power to raise or depress wages at pleasure under the vain hope or excuse that the changes will be confined to the boundaries of cities.

There is no attempt made, and obviously none can well be made, to bring the law within the scope of the police power. It cannot be said that it is a law to promote the public health, or public safety, or public order, and no element can possibly be injected into it to render it valid as a police regulation. There is but one ground, if I understand the argument, upon which this law is defended, and that is, when stated in the broadest way, that cities have no rights that the legislature may not regulate and change at pleasure, since cities, it is said, are created and exist only by the will of the legislature and that the power to which they owe their existence is supreme over every detail of their internal affairs; that a city is but an agency of the state that the latter may command, coerce or direct at will.   Arguments that contain a considerable element of truth are often difficult to answer, even though when considered as a whole they may be unsound and quite misleading, as this argument certainly is.   It is often said in a very general way that cities and other public municipal corporations are agencies of the state, and that is true in so far as they are invested with powers, political or governmental, but surely no one will claim that the relation of principal and agent exists between the state and its several municipalities. Agency is a relation that is generally founded in contract, and the agent, within the scope of his powers, speaks and acts for his principal and so binds him.   The principal may impose his will upon the conduct of the agent by commanding him what to buy and what to sell and he may fix the price at his

pleasure. But it is scarcely necessary to argue that no such relation can possibly exist between the defendant and the state. The city of New York is not an agent of the state in the sense that the legislature may dictate what price it must pay for property or labor that it may need in the conduct of its local affairs. If this were so, then there can be no such thing as home rule for cities and the idea apparently so popular and so much commended is a delusion.

The precise question that we have to deal with here is whether the most important city on this continent, if not in the world, has got such a measure of autonomy and home rule as to render it independent of legislative interference, at least with respect to the price that it shall pay for common labor or other property that it may require in performing its functions as a local government. It would be of very little use to provide, as the Constitution of this state does, that local officers in cities must be either elected by the people or appointed by some local authority, if it still remained in the power of the legislature to prescribe, by statute, to the officers who are elected to take charge of the streets or public works, the minimum wages which the city must pay for labor, or the price it must pay for property, thus depriving the officer of all judgment and discretion in regard to his duties. If a local officer, as the representative of the city, is not left free in this respect he cannot be said to be acting in the exercise of his own judgment or in the interest of the locality but simply obeying the will of the central power. A corporation, whether public or private, is a person within the meaning of the constitutional guaranties for the security of liberty, property and the equal protection of the law. If, therefore, the legislature may not dictate, by statute, to a private person or corporation what he or it shall pay for property, or the rate of wages to be paid to employees, I fail to see where it can get the power to dictate to the city the wages it must pay to the men it must employ in the care of its streets or other public works. If the legislature can deprive a city of the right to hire its own laborers at such wages as they can mutually agree

on, why can it not deprive every corporation of the same right? A private corporation is just as much a creature of the state as a public corporation, but no one has yet contended that a law fixing the rate of wages for a private corporation would be good. When the state creates a corporation, public or private, and sends it forth upon its mission, it becomes invested by the Constitution and the law of its creation with certain rights and privileges that are as inviolable as those of private persons. Its property may not be confiscated or taken from it except by its consent or by due process of law. It cannot be denied the equal protection of the law. The money which a city procures by the exercise of the taxing power cannot be diverted, directly or indirectly, to any private purpose or for the benefit of any class as such. And yet all these constitutional guaranties may be violated if the legislature can fix the wages of laborers or the price to be paid for any property that the municipality may need.

That some or all these constitutional rights have been invaded by the statute in question is quite evident. That will appear from the facts of the present case, and by that I mean the facts stated in the complaint and those that are fairly to be inferred therefrom. The city of New York, in the exercise of its chartered powers, must purchase immense amounts of property, real and personal, and must employ a vast army of laborers, and the money to pay for the same must be procured by local taxation. The state, as such, bears no part of these expenses, and the question is whether it may prescribe by statute the price which the city must pay for such property or the wages for such labor, or must all these things be left for the city itself to settle by agreement upon such terms as may be reasonable, just as such matters are settled by private corporations or individuals? If the legislature should pass a statute prescribing the minimum price that the defendant should pay for the carpets and furniture in the city hall and should even name the merchant or dealer from whom alone they could be purchased, every argument adduced to uphold the statute in question would apply with equal force

to such a law. If the legislature has the power to fix the price of common labor, what objection can there be to a statute fixing the minimum or maximum price of such commodities? This case is a good illustration of the operation of a statute fixing the price of labor. We are informed by the complaint that, prior to the enactment of the Labor Law on May 10th, 1894, the plaintiff was employed by the day to work on the streets and was paid wages at the rate of three dollars per day. There is no claim made that the wages thus paid were not fair wages or the going wages. There is no claim that the plaintiff ever asked or expected any more, but it seems, or at least the complaint so states, that, just as soon as the Labor Law went into effect on May 10th, 1894, "the prevailing rate of wages" at once rose to three dollars and fifty cents per day, but the plaintiff was apparently oblivious of that fact, or, at all events, paid no attention to it, but continued to work in the same way and draw pay at the same rate for six years without, so far as appears, making any objection to the rate of wages, or demanding any increase. Now, it is said that the city is in arrears and is indebted to him in the sum of six hundred dollars, being fifty cents more for each day that he worked and was paid three dollars per day. This claim has, of course, no foundation except in the statute, which, as he claims, gave him the right to the additional fifty cents.

If the plaintiff can recover, so can hundreds and possibly thousands of other people, and such demands in the aggregate must amount to a very large sum of money that the city must raise by taxation and pay to its employees after their work has been performed. Who will assert that the money so paid out of the treasury is devoted to a legitimate city purpose? Who can deny that the millions of dollars which the city is required to raise and pay for such arrears is not in the nature of a gratuity to private persons? The position of the city is that it owes the plaintiff nothing and if it must pay at all it will be under the coercion of the legislative enactment. The power of the legislature over municipal corporations in

all matters political or governmental, within constitutional
limits, is conceded, but surely that does not include the power
to interfere in every detail of its internal affairs, and the
right of the city to hire its own employees who work upon
the streets on such terms as can be fairly agreed upon is one
of the things that does not concern the state, but is confided
to the local authorities.   The compensation of all city authori-
ties and of the clerical force in the several departments may
be fixed and regulated by law, since their duties are public,
political or governmental, but the wages of laborers or the
price of property is something that cannot be fixed and regu-
lated by statute without undermining every principle of local
autonomy.   It would be a very idle ceremony to provide in
the Constitution that all moneys raised by taxation in cities
must be devoted to city purposes if the legislature may enact
a law which will enable the plaintiff at the end of six years
and after drawing pay all the time at the rate of three dollars
per day, that being, so far as appears, all he asked or expected,
to reopen the account to add over fifteen per cent more to the
amount paid to him for his labor and which it is apparent he
was satisfied with at the time as his compensation.

It is no part of the legitimate powers or functions of govern-
ment to fix wages any more than it is to prescribe the price
of bread.  If a statute may be enacted to put wages up, so
may one be enacted to put wages down.   If wages for the
employees of a city can be fixed by a statute at five dollars
per day, they can be fixed at fifty cents per day, all depending
upon the temper of a majority of the legislature.   Such legis-
lation cannot be justified upon the ground that it is aimed
only at a great city existing under a legislative charter.

The argument in that respect embodies a fundamental error,
in that it fails to observe the legal character of a municipal
corporation possessed as it is of dual powers ; the one govern-
mental, legislative or public, and the other proprietary or
private.   When imposing taxes, enacting ordinances and con-
ducting public improvements, the city is exercising a part of
the sovereign power, but in hiring laborers and purchasing

property for the corporate use it acts as a private individual entitled to all the privileges and immunities that the Constitution secures to private persons. These latter powers are conferred and exercised for the private advantage of the particular corporation as a distinct *legal personalty*, and as to such powers and to property acquired thereunder and contracts made with reference thereto, the corporation is to be regarded *quo ad hoc* a private corporation. (Dillon on Municipal Corporations, § 66.) It is upon this principle that cities are made liable for acts or omissions under the law of negligence. The law of master and servant is applicable, just as it is applicable between private parties.

In *Conrad* v. *Trustees of the Village of Ithaca* (16 N. Y. 158) it was held that where the trustees of the village were made by its charter commissioners of highways they were to be regarded, in respect to that function, not as independent public officers, but as the agents of the corporation, so as to make the latter civilly responsible for their acts of omission, according to the law of master and servant. In a note to the case last cited is published an opinion by Judge SELDEN in *Weet* v. *Trustees of the Village of Brockport*, wherein he points out the principle that lies at the basis of the rule which makes a municipal corporation liable under the maxim of *respondeat superior* as follows : " That whenever an individual or a corporation, for a consideration received from the sovereign power, has become bound by covenant or agreement, either express or implied, to do certain things, such individual or corporation is liable, in case of neglect to perform such covenant, not only to a public prosecution by indictment, but to a private action at the suit of any person injured by such neglect. In all such cases the contract made with the sovereign power is deemed to enure to the benefit of every individual interested in its performance." This liability of the municipality as to the care of the streets was again recognized by this court in *Ehrgott* v. *Mayor, etc., of New York* (96 N. Y. 264). Judge EARL, after citing *Conrad* v. *Trustees of Vil. of Ithaca* (16 N. Y. 158); *Requa* v. *City of Rochester* (45 N.

Y. 129); *Hutson* v. *Mayor, etc., of N. Y.* (9 N. Y. 163);
*Davenport* v. *Ruckman* (37 N. Y. 568); *Hume* v. *Mayor,
etc., of N. Y.* (74 N. Y. 264), observed that the rule has been
somewhat criticised, but that "it has the sanction of a wise
public policy, the support of good reasons, and that its opera-
tion is generally just and beneficent." This principle has
been recognized in many other cases in this state that need
not be cited. It has also been approved by the Supreme
Court of the United States in *Barnes* v. *District of Colum-
bia* (91 U. S. 540), and by the Circuit Court of the United
States in *Barney Dumping-Boat Co.* v. *Mayor, etc., of City
of New York* (40 Fed. Repr. 50).

In *Missano* v. *Mayor, etc., of N. Y.* (160 N. Y. 123, 129)
this court held, after a review of the authorities, as follows :
"It is clear upon principle and authority that the city of
New York, in the ordinary and usual care of its streets, both
as to repairs and cleanliness, is acting in the discharge of a
special power granted to it by the legislature, in the exercise
of which it is a legal individual, as distinguished from its
governmental functions when it acts as a sovereign. (*Max-
milian* v. *Mayor, etc.,* 62 N. Y. 164.)"

In the present case the legislature in enacting the Labor
Law was dealing with the city of New York in its proprie-
tary or private capacity, wherein it is to be regarded as a legal
individual as distinguished from its governmental functions
when it acts as a sovereign.

Sweeping aside all forms and seeking to establish the real
legal situation, the city in this respect is nothing more than
an aggregation of private citizens who are taxpayers and as
such are entitled, acting in the combination created by the
charter, to the protection through the legal entity thereby
created, of all those individual rights and privileges precisely
as if each was acting for himself.

If it be true, as the foregoing authorities clearly establish,
that a municipal corporation, acting as a legal individual, is
liable in damages for the negligence of its servant, it must logic-
ally follow that it is entitled to all the immunities and privi-

19

leges incident to that situation, and this involves the right of
the city under the Constitution to hire its own laborers and
servants, since it would be intolerable if their employment
could be regulated and controlled by the central power, while
the city alone is made liable for their negligence or mistakes.
The legislature may authorize burdens to be imposed upon
them for public works or improvements and possibly may
require the same by mandatory laws in the interest of the
general public, but this does not embrace the power to dic-
tate to the city the wages it shall pay to its employees in
the performance of its work or to deprive the local authori-
ties who act for the taxpayers of all judgment and discretion
upon that subject. A taxpayer in a city has the right to have
such questions decided by the judgment of the local authori-
ties who represent him and not by the central power at the
capital of the state.

It is a curious fact that every argument in support of stat-
utes of this character, whether proceeding from the bench or
the bar, contains the broad admission that if such laws were
made applicable to private corporations or individuals they
would then be clearly in conflict with the Constitution.
These arguments, like that to sustain the statute in question,
entirely overlook or ignore the important distinction between
these powers and functions of municipal corporations that are
public or political and those that are private. This distinc-
tion has nowhere been better stated and illustrated than in
the opinion of Judge COOLEY in the case of *People ex rel. Park
Comrs.* v. *Common Council of Detroit* (28 Mich. 228). After
stating what he considers as settled law, the proposition that
cities, considered as communities endowed with peculiar func-
tions for the benefit of their own citizens, have always been
recognized as possessing powers and capacities and as being
entitled to exemptions distinct from those which they possess
or can claim as conveniences in state government; that they
possess powers and capacities which are *private* in contradis-
tinction to those in which the state is concerned and which
are called *public,* thus putting such corporations, as regards

all such powers, capacities and interests, substantially on the footing of private corporations or individuals, the learned judge then proceeds to amplify this distinction as follows: "Whoever insists upon the right of the state to interfere and control by compulsory legislation the action of the local constituency in matters exclusively of local concern, should be prepared to defend a like interference in the action of private corporations and of natural persons. It is as easy to justify on principle, a law which permits the rest of the community to dictate to an individual what he shall eat, and what he shall drink, and what he shall wear, as to show any constitutional basis for one under which the people of other parts of the state, through their representatives, dictate to the city of Detroit what fountains shall be erected at its expense for the use of its citizens, or at what cost it shall purchase, and how it shall improve and embellish a park or boulevard for the recreation and enjoyment of its citizens. The one law would rest upon the same fallacy as the other, and the reasons for opposing and contesting it would be the same in each case. And while it may be entirely possible that in any particular instance the interference would be beneficial to the person or the community whose rights are invaded, it is not to be overlooked that an interference to compel a person to submit to something for his own good may be made use of as a precedent to compel him at some future time to submit to extortion and plunder. The law very properly draws a line between that which is admissible and that which is not, and it does not allow outside dictation in matters purely of local concern, for one very good reason, among others equally good, that the motive for outside interference will very likely be something besides a desire to do good to a community in which the parties interfering have no personal interest, unless of a merely sentimental nature, and whose burdens they are not to share, or enjoyments participate in. All such matters are left to those whose interests will prompt them to act with prudence, and who because of their interest, and because they relate to matters that must come under their own view and

observation, they are presumptively best qualified to decide upon."

It was held in the *Orange County Road Constr. Co. Case* (*supra*) that a statute making it a crime for a person contracting with a municipal corporation to require more than eight hours' work for a day's labor was unconstitutional and void. It was held in the *Rodgers Case* (*supra*) that a similar statute forfeiting a contractor's right to compensation for his work if he omitted in doing the work to pay what is called the prevailing rate of wages, was also in conflict with the Constitution. In the *Rodgers* case the city resisted the claim of the contractor for compensation. It had no other defense and this court held that it constituted no answer to the contractor's claim to set up a violation of a statute which was invalid and beyond the power of the legislature to enact. What distinction, if any, there is or can be between these cases and the one at bar I confess I am unable to state. I leave that to my brethren who now differ with me, only adding that it does not seem to me wise to introduce fanciful distinctions in the construction of statutes of this character whenever the membership of the court happens to be changed. It must be remembered that in the *Rodgers* case it was the city that set up and claimed the protection of the statute, and we held that the law had no force or effect to defeat the claim of the contractor, but in the present case it is to be held that it is a good basis for a common laborer upon which to assert a valid claim against the city treasury; or, in other words, a statute held to be void as against the claim of the contractor is the very cornerstone and foundation for a claim against the city by one of its servants or employees.

I am in favor of affirming this judgment on the point first above stated, but I am not in favor of going out of our way to change the construction already given to the Labor Law on the basis of a distinction so frail and fanciful as that contended for by the learned counsel for the plaintiff.

HAIGHT, CULLEN and WERNER, JJ., concur with PARKER, Ch. J.; BARTLETT and VANN, JJ., concur with O'BRIEN, J.

Judgment affirmed.