THE PEOPLE OF THE STATE OF NEW YORK, on the Complaint of MORRIS RABINOWITZ, Complainant, *v*. BENNY DESOWITZ and SOLOMON GREENSTEIN, Defendants.

City Magistrates' Court of New York, Borough of Manhattan, Seventh District, January 5, 1938.

*Harry Sacher* [*Samuel Sacher* of counsel], for the complainant.

*Louis Jackson*, for the defendant Benny Desowitz.

BROMBERGER, C. M. The defendants are charged with violation of section 962 of the Penal Law. The facts which form the basis of the prosecution are relatively ·simple. The complainant, a member of District Council No. 9 of the Brotherhood of Painters, Decorators and Paperhangers of America, testifies that he was intermittently employed as a painter by the defendant Desowitz, a member of the Association of Master Painters of the City of New York. The defendant Greenstein is another employee of his codefendant.

At the time of the complainant's re-employment following a strike, a trade agreement, by which the defendant employer was bound, had been entered into between the brotherhood and the association which provided, so far as it is material to this prosecution, for the payment of " the prevailing rate of wages for journeymen painters * * * $1.50 per hour, being $10.50 for a 7-hour day." Under the provisions of that agreement, now in evidence before me, those were the recognized and established rates, and specifically stipulated therein as the prevailing rates of pay for the type of skilled labor here involved.

On November 9, 1937, upon invitation of the defendant Desowitz, the complainant went to the said defendant's office, where he was informed by him that if he wanted to go to work he would have to do so " like the other fellows," and that he would be required to make a deal with the said defendant. After working November 10, 11 and 12, 1937,. the complainant received thirty-one dollars, and was told by the defendant Desowitz not to forget that on the

following Monday (November fifteenth) he had to give him the "kick-back" money, indicated by Desowitz as one dollar and fifty cents per day. The complainant did not make the demanded payment on Monday, and the following day the defendant Desowitz came over and again demanded it. Thereupon the complainant gave Desowitz four single dollar bills, now in evidence, which had previously been identified by number and otherwise marked by a police officer to whom the matter had been referred. The defendant Desowitz, upon receiving the said four dollars, then passed them to the defendant Greenstein who, when the officers entered and began questioning the defendants, in turn surrendered the marked currency to the arresting officer.

The defendants contended that the four dollars represented merely the return of an amount which the complainant had previously been overpaid. The record completely lacks proof to support this alleged defense.

At the conclusion of the People's case the defendants moved to dismiss the information, and, in support of the motion, urge, *first*, that the evidence is insufficient to support the charges; *second*, that the statute is unconstitutional and, in fact, meaningless in its context.

In support of the alleged insufficiency of the evidence the defendants contend that the complainant's testimony is incredible and should be rejected as such, arguing, among other grounds, that the complainant was a so-called "25 percenter." The defendants contend that Desowitz was compelled, under the trade agreement to which reference has been made, to employ men selected by the brotherhood to the extent of twenty-five per cent of his force; that, accordingly, the employer, having no choice in his selection or discharge, the complainant could not be intimidated by threat or fear of discharge if he refused to "kickback" any part of his earnings. However, the testimony established that the defendant could reject men sent to him by the brotherhood even in the twenty-five per cent class, and actually did so in at least one instance immediately preceding complainant's employment.

It is clear to me that the defendants' further contentions with respect to alleged inconsistencies and contradictions in the complainant's testimony are without merit. The prosecution has established a *prima facie* case upon the facts, and I am satisfied that the complainant's testimony is truthful and credible and that it is supported by ample corroborative facts and circumstances.

Upon the law I am also satisfied that a *prima facie* case has been established here and that the challenge of the unconstitutionality of the statute is untenable.

Section 962 of the Penal Law, so far as it is material, provides: "Whenever an agreement for the performance of personal service requires that workmen engaged in its performance shall be paid the prevailing rate of wages, it shall be unlawful for any person, either for himself or any other person, to request, demand, or receive, either before or after such workman is engaged, that such workman pay back, return, donate, contribute or give any part or all of said workman's wages, salary or thing of value, to any person, upon the statement, representation, or understanding that failure to comply with such request or demand will prevent such workman from procuring or retaining employment."

Counsel for defendant argues that these provisions are so ambiguous and uncertain as to render the statute unconstitutional. It must be agreed that the statute has been poorly drawn. Technically, the clause beginning " that such workman pay back " is the object of the word " receive " as well as of the words " request " and " demand."

While it is true that technical grammatical faults exist in the statute, they are not of such a character that they obscure the legislative intent or cloud the proper comprehension of the statutory provisions. As the Court of Appeals has aptly observed (*Wood* v. *Duff-Gordon*, 222 N. Y. 88, 91): " The law has outgrown its primitive stage of formalism when the precise word was the sovereign talisman, and every slip was fatal."

Tested by this rule and the historical background which preceded this legislation, its meaning, intent and purport are unmistakable, and it would indeed be an exceedingly immature or prejudiced person who failed to understand its provisions.

It may be well briefly to trace the development and growth of the " kickback " in order to comprehend the evil whose impact compelled the corrective legislation now under consideration.

The " kickback " system is simplicity itself, and because of this it is the harder to detect and suppress. It requires no complex organization to be effective. Its success depends almost wholly upon one of the most basic of all natural human instincts — that of fear of material want on the part of the worker for himself and for his dependents.

During the first part of the present decade this system, especially in the building and allied trades, attained such alarming proportions that resort to legal and extra-legal means of suppression were required. Thus, in 1933, a mason's helpers employed on the construction of a municipal project were compelled by the contractor to " kickback " two dollars and ninety cents of the nine dollars and ninety cents paid per diem for an eight-hour day

specified in the building contract. In a joint civil suit in the Municipal Court by sixteen workers, aggregate damages of $2,500 were awarded, and this judgment was affirmed on appeal. (*Davis* v. *C. & W. Construction Co., Inc.*, N. Y. L. J. Nov. 25, 1933, p. 1956 [App. Term, First Dept.].) The Appellate Division refused to review the determination. (N. Y. L. J. Dec. 30, 1933, p. 2492; denial of leave to reargue, Id. Jan. 23, 1934, p. 362.)

The attempt at criminal prosecution was less successful. The Court of General Sessions, New York County, in April, 1934, held that a contractor receiving back part of the wages of a plasterer's helper was not guilty either of extortion or of coercion, upon the ground that the employee had taken the position with knowledge that he might have to " kickback " part of the wages fixed by the union contract. The fact that the employee had acceded to this agreement only because of fear of losing his position was not viewed as a controlling factor sufficient to sustain the charge. (*People* v. *Cuddihy*, 151 Misc. 318; affd., 243 App. Div. 694.)

It was against a background of which the foregoing are typical instances that the Legislature passed the statute (effective September 1, 1934) with which we are here concerned, outlawing the " kickback " in certain instances under penalty of penal sanction.

It should be noted in this regard that section 1(b) of the Federal Public Contracts Act, requiring the payment of the minimum wages prescribed by the Secretary of Labor " without subsequent deduction or rebate of any kind," forbids any practice reducing the net wage below the established minimum. This includes, among others, deductions for " kickbacks."

In addition to eradicating a growing and extortionate evil, the New York statute is distinctly salutary alike to the honest employer and employee. The " kickback " system is doubly vicious, since it not only deprives a workman of the compensation to which he is justly entitled, but also enables those who compel " kickbacks " from their employees to obtain an unfair, unjust and discriminatory advantage over those of their competitors who are either observing the terms of an agreement or otherwise paying the prevailing rate of wage.

The statute, striking as it does at the root of the evil, protects the workman as well as those employers who are conducting their operations in an ethical manner with fairness and justice to their employees.

Hence the statute cannot be regarded solely as labor legislation, but as an enactment equally beneficial to capital, insuring parity of labor cost in the same localities, and thus, within proper limits, establishing competitive equality on one of the basic calculations for those engaging the same classification of labor.

The old idea that there must be exact and minute definiteness in a law in order that it be enforcible, either criminally or civilly, is rapidly disappearing, and the courts of this country are approaching the attitude of the English tribunals requiring that, for their enforcibility we need merely find some reasonable rule within the statutory provisions.

This court cannot be oblivious to the obvious legislative intent and proceed mechanically to destroy a statute which can be saved by the application of common sense and proper interpretation.

Where the Legislature has fashioned a hull of sound timber that will safely and securely float upon the sea of rational understanding, the court will not wreck the vessel nor permit it to founder because of an inconsequential defect in a seam that can readily be caulked.

It is clear that the statute applies to those who request or demand that such workmen " kickback," and, likewise, to those who " receive " such " kickback " upon such " request " or " demand." To hold otherwise would not only be senseless but would, without legal justification, emasculate an exceedingly valuable piece of legislation upon a mere technical deficiency in grammatical construction.

A further challenge to the constitutionality of this statute, while not presented in this prosecution, has been raised before me in another prosecution for a similar violation, involving the provision " prevailing rate of wages." It has been urged that there is such uncertainty therein that the statute is invalid; that it deprives the defendants of due process of law.

In *United States* v. *Capitol Traction Co.* (34 App. D. C. 592) the court observed (at p. 598): " Penal statutes prohibiting the doing of certain things, and providing punishment for their violation, should not admit of such a double meaning that the citizen may act upon the one conception of its requirements and the courts upon another." (Quoted in *Connally* v. *General Construction Co.,* 269 U. S. 385, at p. 393. Cf. *United States* v. *Cohen Grocery Co.,* 255 id. 81.)

In the *Connally* case (*supra*) the facts were as follows: An injunction was sought to restrain the law officers of Oklahoma from the enforcement of a somewhat similar penal statute. The wages paid by the employer were three dollars and twenty cents per day. The Commissioner of Labor complained that three dollars and sixty cents should be accepted as the " current rate * * * in the locality." His own investigation showed, however, that the wages varied in the locality from three dollars at one extreme to four dollars and five cents at the other. These were conceded facts, for the case was heard upon demurrer to the bill. Under these

circumstances the court held that in its application to that employer the statute requiring the payment of " current rate of wages in the locality " to persons employed on public work was too obscure and indefinite to sustain a charge of crime. This is the strongest authority which can possibly be cited to uphold the position of unconstitutionality in the present instance.

However, the situations are readily distinguishable. Aside from the additional obscurity imparted to the statute by the use of the qualifying word " locality," the decision in the *Connally* case is based upon the wideness of the range covered by the term " current rate." The court says (p. 393): " In the first place, the words ' current rate of wages ' do not denote a specific or definite sum, but minimum, maximum, and intermediate amounts, indeterminately, varying from time to time and dependent upon the class and kind of work done, the efficiency of the workman, etc., as the bill alleges is the case in respect of the territory surrounding the bridges under construction. The statutory phrase reasonably cannot be confined to any of these amounts, since it imports each and all of them. The ' current rate of wages ' is not simple, but progressive — from so much (the minimum) to so much (the maximum), including all between — and to direct the payment of an amount which shall not be less than one of several different amounts, without saying which, is to leave the question of what is meant incapable of any definite answer."

In the instant situation this problem is not encountered. The public policy of the State declared by successive Legislatures during a period of over forty years, beginning with chapter 415 of the Laws of 1897, exacting the payment of the rate of wages prevailing in the vicinage to laborers or mechanics employed upon public works, makes it clear that the statute here in question, unlike that considered by the Supreme Court in the *Connally* case, contemplated some specific or definite sum and not a large range of sums. Were this not already sufficiently clear the provisions of subdivision 5 of section 220 of the Labor Law would be determinative. The Legislature there painstakingly and with great definiteness defined its intendment of the phrase " prevailing rate of wage." While the provisions of the penal section do not specifically refer to this definition, its incorporation by reference follows almost as a matter of course.

While there is no reported authority interpreting the statute before us, the trend of judicial decision sustains its constitutionality and enforcibility. Let us consider the vicissitudes of the prevailing-wage-on-public-works statutes. *People ex rel. Rodgers* v. *Coler* (166 N. Y. 1) held an early statute void. A majority of the court

discerned an invasion of the constitutional rights of the municipality itself. The same majority discerned an invasion of the liberty of the contractors and a denial of the due process of law when the privilege of hiring labor on any terms obtainable was obstructed or withdrawn. However, *Atkin* v. *Kansas* (191 U. S. 207) undermined this position completely and effectually. The decisions thenceforth were notable for increasing liberality. (*Ryan* v. *City of New York*, 177 N. Y. 271; *People ex rel. Cossey* v. *Grout*, 179 id. 417; *People ex rel. Williams Engineering & Contracting Co.* v. *Metz*, 193 id. 148.) Finally, Mr. Justice Cardozo, rejecting the plaintiff's demand to " have us hold that from the throes of this long struggle there emerged a statute without meaning, a futile and deceptive gesture," held in *Campbell* v. *City of New York* (244 N. Y. 317) that no constitutional rights of one contracting to perform public work are infringed by the insertion in the contract, by statutory command, of a provision providing for payment of prevailing rate of wages.

In the light of this trend as exemplified by this set of cases, and because of the sharp and precise definition set out in the Labor Law, I hold, in the absence of contrary compelling authority, that the phrase " prevailing rate of wages " is sufficiently clear to meet the requirements of the legal test and to sustain a penal sanction based upon it.

It appearing to me that the crime charged has been committed and that there is sufficient cause to believe the defendants guilty thereof, I order them held to answer the same.