FRANK H. MORSE, Plaintiff, *v.* JOHN H. DELANEY and Others, Constituting the Board of Transportation of the City of New York, and Others, Defendants.

Supreme Court, New York County, November 16, 1926.

Municipal corporations — subway contracts — Labor Law of 1921, § 220, subd. 3, requiring provision in contract, to which municipal corporation is party, of clause reciting employee shall be paid not less than " prevailing rate " of wages, is constitutional — such provision in contract, covering subway construction work in city of New York, is valid — article in contract defining what constitutes " prevailing rate " of wages, and term " locality," as employed in said statute, is valid — Rapid Transit Act (Laws of 1891, chap. 4), § 37, subd. 2, permitted said article to be made part of contract subsequent to public hearing required by said statute — fact that contract makes term " locality," as employed in said statute, coterminous with city of New York, immaterial — clause providing for arbitration, proper.

A provision in a contract covering subway construction work in the city of New York, which provides for the payment of the " prevailing rate " of wages in accordance with subdivision 3 of section 220 of the Labor Law of 1921, which makes it mandatory to recite in any contract, to which a municipal corporation is a party, such a clause, is not invalid, for said statute is constitutional.

Moreover, an article in said contract as to what constitutes the " prevailing rate " of wages and defining the term " locality," as employed in subdivision 3 of section 220 of the Labor Law, is clearly within the intendment of the statute, and is valid, for the statute imposes a duty upon a public officer charged with the employment of labor to inquire what the prevailing rate is, so as to enable

him to fix it for the labor he employs, and the inclusion of working rules in said contract to carry out the intent of the statute is not only proper, but necessary. The fact that said article was made a part of the contract subsequent to the statutory hearing required by subdivision 2 of section 37 of the Rapid Transit Act (Laws of 1891, chap. 4, as added by Laws of 1894, chap. 752, and amd. by Laws of 1917, chap. 625), does not invalidate said provision, for said act in part provides that the commission may after a hearing alter, modify or amend the proposed contract in any manner in its discretion.

The objection that the definition of the term " locality," by making it coterminous with the city of New York, in spite of the fact that the subway work is being confined to Fifty-third street, between Second and Eighth avenues in said city, is without merit, for it is entirely within the spirit of the statute to set its limits as the bounds of the city of New York in connection with the contract in question.

A further clause in said contract, providing that questions arising therein shall be determined by arbitration, is proper, for said clause was clearly intended to expedite the work and save the delays incidental to resort to the courts.

ACTION to restrain award and execution of subway contracts.

*Bandler, Haas & Collins* [*John F. Collins* and *Franklin Nevius* of counsel], for the plaintiff, for the motion.

*William G. Fullen* [*Ralph R. Monroe* and *George E. Coughlin* of counsel], for the Board of Transportation, in opposition.

*George P. Nicholson, Corporation Counsel* [*Arthur J. W. Hilly* and *Joseph L. Pascal* of counsel], for the Board of Estimate and Apportionment and The City of New York, in opposition.

*Frank X. Sullivan,* for the New York State Federation of Labor and Building Trades Council, *amicus curiæ,* in opposition.

LEVY, J. The plaintiff has brought an action to restrain the award and execution of certain subway contracts in the city of New York covering the construction work on West Fifty-third street from Eighth avenue to Second avenue, and has also made a motion for an injunction *pendente lite.* Defendants in turn have moved to dismiss the complaint on the ground of insufficiency. The basis of plaintiff's grievance is that the contracts provide for the payment of " the prevailing rate of wages," a clause inserted pursuant to section 220 of the Labor Law of 1921; that the law is unconstitutional by reason of uncertainty as to what constitutes the *prevailing* rate; and that the inclusion of the clause will result in a waste of the city's funds. The further objection urged is, that even if this provision should be held constitutional, it was violated by the addition to the contract of article LXVII, subsequent to the statutory public hearing required by subdivision 2 of section 37 of the Rapid Transit Act (Laws of 1891, chap. 4, as added by Laws of 1894, chap. 752, and amd. by Laws of 1917, chap. 625), which article contains provisions purporting to determine the

meaning of what constitutes " the prevailing rate of wages " and of the term " locality " as employed in the statute. These provisions, it is argued, are not authorized by law. In addition, an arbitration clause is incorporated in that article, providing for the settlement of any controversy which might arise, and it is said this is also illegal as divesting the court of jurisdiction.

An examination of the article in question, therefore, becomes essential. After providing for the contractor's compliance with the requirements of section 220 of the Labor Law, as to the eight-hour day and the payment of prevailing rate of wages for a legal day's work in the locality, it continues:

" It is distinctly understood and agreed as one of the principal moving considerations to the City for entering into this Contract, that for the purpose of this contract the ' locality within the State ' as used in this Article, shall be and be understood to be the City of New York, as existing at the time this contract is delivered.

" It is further so understood and agreed between the parties to this contract that the ' prevailing rate ' of wage shall be that rate paid to a majority of the laborers, workmen or mechanics, engaged in the same trade or occupation in the City of New York. In the event that there is not a majority in the same trade or occupation in the City of New York paid at the same rate, then the rate paid to the greater number of such trade or occupation in the City of New York shall be the prevailing rate, provided that such greater number constitute at least forty percentum of the laborers, workmen or mechanics engaged in such trade or occupation in the City of New York; in the event there is less than forty percentum of the laborers, workmen or mechanics engaged in the same trade or occupation in the City of New York paid the same rate, then the average rate paid to such laborers, workmen or mechanics in the same trade or occupation, shall be the prevailing rate. For the purpose of determining the number of laborers, workmen or mechanics engaged in any such trade or occupation, all the laborers, workmen or mechanics engaged in the performance of work under this contract and all other laborers, workmen or mechanics in the City of New York engaged on similar work to that required under this contract, whether Rapid Transit Railroad Construction or otherwise, shall be included in such total number.

" The Contractor hereby as one of the inducements to the City to enter into this contract particularly agrees to the provisions of this Article with respect to the ' locality within the State ' and the ' prevailing rate of wage ' for the purposes of this contract and shall not make or have any claim that any of the provisions of this Article are void or *ultra vires* in any respect or for any purpose."

The article then provides for arbitration to be conducted by disinterested persons selected respectively by each party, the two thus chosen to designate a third; and if the former fail to agree upon such umpire, he is to be nominated by the presiding justice of the Appellate Division. The result of the determination of a majority is to be final and conclusive, and the expense of the arbitration is to be equally divided between the parties to the contract.

In support of the contention that the provision of law requiring the payment of the prevailing rate of wages is unconstitutional, plaintiff cites with apparent emphasis the very recent case of *Connally* v. *General Construction Company* (269 U. S. 385). In that case an injunction was sought to restrain certain State and county officers from enforcing a quite similar labor statute of the State of Oklahoma, which required that persons employed by or on behalf of the State should be paid " not less than the current rate of *per diem* wages in the locality where the work is performed." For a violation of this law a penalty of not less than $50 nor more than $500 was to be imposed, or imprisonment for not less than three nor more than six months. The court, dealing with this phase of the law, granted the injunction on the ground that as a penal statute it was not sufficiently explicit to inform those who are subject to it just what conduct on their part would render them liable to its penalties. Mr. Justice HOLMES and Mr. Justice BRANDEIS concurred in the result on the ground that the plaintiff there was not violating the statute by any criterion available in the vicinity of Cleveland, Okla., the place where the work was to be performed.

It will be noted that the scope of the decision is limited to the criminal feature of the statute, in so far as it seeks to impose the penalties of fine or imprisonment. Obviously, it does not assume to dictate the propriety of a policy which prescribes the incorporation of the prevailing wage rate requirement in a public contract. Nor does it attempt to circumscribe the right of the State or its political subdivisions to enforce any *civil* penalty for violation of the contract. Whether in view of the conditions peculiarly existing in a city like New York, evidently differing from those of a sparsely populated locality in a remote western State, and whether in view of the use of the word " prevailing " in our statute as distinguished from " current " in the Oklahoma one, a contrary result would be reached and the New York statute sustained even in respect of the criminal feature, it is unnecessary now to decide. For assuming that the law, so far as it requires the payment of the prevailing rate of wages in the locality, is too indefinite to be made the basis of criminal prosecution it does not necessarily

follow that the policy of the State maintained for nearly thirty years, followed by department heads and contractors and sanctioned in principle by constitutional enactment, should be entirely disregarded. Plaintiff himself does not go thus far in his contention. He concedes the validity of the eight-hour feature embodied in section 220 of the Labor Law, but he challenges the legality of the provision requiring the payment of the prevailing rate of wages, urging the indefiniteness of the standard adopted. Whatever argument may be adduced in support of the proposition that a criminal prosecution cannot be sustained, can have no application to the validity of the policy which dictates the maintenance of the prevailing rate as a provision in contracts involving public work. A similar point raised against the emergency rent laws on the ground that they were invalid for uncertainty as to what constitutes a reasonable rent or an oppressive agreement, was thus disposed of by the Court of Appeals, Judge Pound writing, in *People ex rel. Durham Realty Corporation* v. *La Fetra* (230 N. Y. 429, 449): " No constitutional difficulty presents itself in the way of enforcing the laws on the ground of uncertainty as to what constitutes a reasonable rent or an oppressive agreement. Courts and juries are in civil cases constantly dealing with questions of proper care, just compensation, reasonable conduct, fair market value and the like. It is quite a different thing to say that Congress may not punish the act of making ' any unjust or unreasonable rate or charge ' in dealing with necessaries because the language is too indefinite and uncertain upon which to fasten criminal liability. ( *U. S.* v. *Cohen Grocery,* 255 U. S. 81.) The test is not what the jury may say, but what the jury may reasonably infer from the evidence. (*Nash* v. *U. S.,* 229 U. S. 373.) "

It is no more difficult to determine in a civil action what is the prevailing rate of wages than what is a reasonable rent or what is the fair market value of a given article at a particular time, perhaps, even a trifle easier. Various definitions of the phrase, it is true, have been given by way of dicta in a number of judicial opinions. These expressions must be considered in the light of the fact that they were made before the clear recognition of the constitutional amendment which gave the Legislature authority to regulate and fix wages in connection with public work, and before the clarity of the concept had been fully tested by experience. Thus, in *People ex rel. Rodgers* v. *Coler* (166 N. Y. 1, 16) Judge O'Brien said that it " calls for the payment, practically, on all occasions of the highest market price, and hence, must compel the contractor to employ only such workmen as are competent to earn the very highest rate of compensation." Chief Judge Parker, in his dissenting opinion (p. 26) believes that the

*going* rate of wages is intended, and the bounds of the locality, as far as municipal work is concerned, are to be measured by the limits of the city in which the work is to be performed. While the substitution of the word " going " for the word " prevailing " is of little assistance, the utterance is helpful as an explanation of the term " locality." Again, Judge HAIGHT, dissenting in the same case (p. 42), holds that it means the " prevailing, current, general or common rate. In other words, it is the market rate or that which the services are fairly and reasonably worth * * *. *If the prevailing or the market rate means the reasonable value, it, in the absence of a contract expressly fixing the rate, is just the amount which a court of law would award as damages in an action to recover pay for services rendered, and to this extent the provision is but the re-enactment of a part of the common law.*" (Italics mine.) In *People ex rel. Rolf* v. *Coler* (58 App. Div. 347, 350) Mr. Justice INGRA-HAM, referring to the same subject, said: " But the Legislature had not provided that the contractor should pay the rate of wages fixed by a labor union, or any other particular body or association; but that he is to pay the rate that prevails in the locality, which must mean, I suppose, the wages received generally by those who are working at the same trade or occupation."

We thus have a range of opinion which, while varying in expression, substantially points, with but one exception, to an inter-pretation of the " prevailing rate " as the " fair market rate." The dictum of Judge O'BRIEN that it means the *highest* market rate is not in accord with the economic facts and grievances which resulted in this particular labor legislation. But while " market rate " is a much more familiar term than " prevailing rate," never-theless efforts at further definition and precise analysis seem essential, because a series of working rules have been embodied in the contract in order to better carry out the intent of the law. If these are not consistent with a reasonable interpretation of the standard of " prevailing rate of wages " which, as we have seen, the law prescribes, they may be said to be illegal. As a general rule, resort to lexicographers for the meaning of a word having technical significance results in enlightenment. And, while ordinarily a dictionary definition furnishes a working basis for the interpretation of words as employed in a statute, here it can hardly afford an explicit guide in the explanation of a phrase, an intelli-gent comprehension of which can be adequately obtained only by reference to the industrial movement which gave birth to it. For it can hardly be doubted that the Labor Law of 1897 (Laws of 1897, chap. 415, § 3), which first expressed the prevailing wage rule in our State legislation, was not in its concept the sudden crea-

tion of our law-making body, but the manifestation of an economic movement extending over many years. The purpose of the legislation can be well gathered by analogy from the wording of the so-called " Fair Wages Resolution," passed by the English House of Commons in February, 1891: " That, in the opinion of this House, it is the duty of the government in all government contracts to make provision against the evils recently disclosed before the Sweating Committee, to insert such conditions as may prevent the abuse arising from subletting, and to make every effort to secure payment of such wages as are generally accepted as current in each trade for competent workmen."

After the adoption of the law of 1897 in this State, both the prevailing rate and the eight-hour features were attacked, with varying success, as unconstitutional. Thus, in *People ex rel. Rodgers* v. *Coler* (*supra*), the prevailing wage law as applied to independent contractors employed by the municipality was held unconstitutional; in *People* v. *Orange County Road Const. Co.* (175 N. Y. 84) the eight-hour law as applied to such contractors was held void; in *Ryan* v. *City of New York* (*infra*) the prevailing wage feature was held valid only in so far as direct employees of the State or a municipality are concerned; in *People ex rel. Cossey* v. *Grout* (*infra*) the eight-hour law enjoined upon contractors performing municipal work was held an unconstitutional interference with the right of the municipality. The amendment of 1905 embodied in article XII, section 1, of the State Constitution, was intended to set at rest all doubt as to the right of the Legislature to " regulate and fix the wages or salaries, the hours of work or labor " of persons employed in public work, either directly by the State or its subdivisions, or by a contractor engaged in the performance of such service. It may be observed that the Legislature was given power both to *regulate* and *fix* wages. As popularly understood, the term " fix " in this connection implies the establishment of a definite rate of pay, while the term " regulate " involves the adoption of a rule or guiding principle to be followed by the authorities in fixing the rate of wages. Following the adoption of the constitutional amendment, the Legislature proceeded to re-enact section 3 of the Labor Law (Laws of 1906, chap. 506), parts of which had been previously declared unconstitutional, in the form substantially identical with the present section 220, enacted in 1921. In limiting the number of hours of labor to eight, it availed itself of its authority to *fix* them as a definite quantum, influenced no doubt by the consideration that the elements which enter such a fixation — human efficiency and endurance — are relatively stable. But when it came to legislate in the matter of wages, regulation

by the adoption of a guiding principle seemed much wiser than the establishment of a schedule of definite rates. Wages, like commodities, subject as they are to the economic law of supply and demand, with the additional factor of the variable cost of living, did not lend themselves to the setting of any fixed or permanent rates; and it might have been futile and perhaps unwise to attempt to establish these, particularly as regards the compensation of persons in the labor class. Nevertheless, although no fixed scale was provided, department officials, as will presently be seen, were expected to maintain such a scale, at least where they employed labor directly, in accordance with the principle of the statute. Thus, in *Ryan* v. *City of New York* (177 N. Y. 271, 278) the court construed the duty of State officials as follows: " Section 3 of the Labor Law does not attempt to fix in dollars and cents the wages to be paid to those employed on state or municipal work, but provides that such wages ' shall not be less than the prevailing rate for a day's work in the same trade or occupation in the locality.' The statute, therefore, made it the duty of the person charged with employing plaintiff to ascertain the prevailing rate of wages for similar services in the city, and then to fix the compensation at that amount, or a still greater one, and by the section following the legislature undertook to assure such action by the officials commanded to fix wages at *not less* than the prevailing rate by providing that an official violating the provisions of the act would be guilty of malfeasance in office, and be suspended or removed."

And in *Wright* v. *State of New York* (223 N. Y. 44, 47), in which the State Superintendent of Public Works as an employer of labor was involved, the court held that " It was incumbent upon him to ascertain the prevailing rate of wages in the localities where mechanics, workingmen and laborers were employed by the state and regulate the compensation for each as required by the amended law." Furthermore, in *McNulty* v. *City of New York* (238 N. Y. 29, 32) the court, referring to the compensation of a person in the labor class, said that the proper authorities of the city of New York may under the provisions of the charter of that city, fix the compensation to be paid to him, but they may not fix that compensation at a lower rate than permitted by the Labor Law in accordance with the prevailing rate rule. These citations indicate that notwithstanding the fact that the statute fixes no wage scale, it is nevertheless the duty as well as the right of public officials to ascertain the prevailing rate, and determine wages accordingly. Apparently, they have endeavored to comply with their duty in the past, and seemingly have been able to arrive at decisions that are reasonable and within the spirit of the law.

That the phrase has not been a vague notion to the expert mind in touch with market conditions must be evident from the length of time the statute has been in force and the comparatively few practical difficulties encountered in its application.   The administrators of the law were confronted with a situation where duty compelled them to comply with its guiding intent under penalty of losing their official heads.   The practical working of the statute seemed to be fraught with less difficulty than a theoretical analysis would indicate.   This was perhaps due to the fact that there was a well-understood notion of what the law intended, difficult perhaps to formulate in precise terms, but nevertheless practically operative.

An interesting interpretation of the statute which supplies the possible lack of precision in much of the current discussion, is found in an article by George Gorham Groat in " Political Science Quarterly," volume 21, page 414, entitled " The Eight Hour and Prevailing Rate Movement in New York State."   The writer was formerly professor of economics in Ohio Wesleyan University and is now head of the department of economics in the University of Vermont.   He is the author of " Trade Unions and the Law in New York," " Attitude of American Courts in Labor Cases," and " An Introduction to the Study of Organized Labor in America," and is, therefore, obviously an authority on labor legislation.   His article is especially illuminating, because his conclusions are based upon an historical perspective of the " prevailing rate " movement, and he is speaking with a mind that is fresh with the experience that led to the passage of the statute of 1897 and the subsequent constitutional amendment of 1905.   Writing in September, 1906, he says at page 432: " Now what is the ' prevailing ' wage?   It is a wage rate that has been established by competition: competition between organized capital on the one side and organized labor on the other. It may be true that one side or the other has had some temporary advantage and has succeeded in affecting wages accordingly.   But in what does the wage rate consist when *not* the ' prevailing ' wage? In that case it is an adjustment between organized capital on the one hand and unorganized labor on the other.   In such competition there can generally be nothing fair and open.   The advantage of one side is too great.   The prevailing rate is probably the nearest practical approach attainable in our present industrial organization to a rate fixed by fair and open competition.   The state can never enter into a competition that will not be one-sided. It therefore will do best to accept the result of competition that has been working in circumstances that are most nearly fair. *   *   *   The law is expressed by the amendment recognized that organization among employers is an accomplished fact, and that

such organization gives the employer a decided advantage in 'higgling' for wages. It decrees that wherever organizations of labor and organized employers have reached a satisfactory working scale of wages, such scale shall be adopted in cases of work done for city or state. It is the most practical working arrangement feasible in our industrial world as at present organized."

Familiar illustrations of wage scales determined by adjustment between organized capital and organized labor are those in the building trades, in the coal mining industry, in the needle trades, and others. Now, the market rate having been ascertained for the particular class of work, in the manner presented by Professor Groat, the rate paid to persons outside of such agreement will naturally gravitate toward that scale. There may be workmen outside that group who are so efficient as to command a higher wage. On the other hand, a larger number not enjoying the advantages of such an agreement may be compelled to work for a lower rate. It will thus follow that a particular class of workers in a locality will, as a rule, operate under wages showing certain gradations. If industrial groups, both of labor and capital, which have established wage agreements, largely dominate their particular industry, the probable effect will be that a majority of all the workmen in that particular line of endeavor will be paid the rate fixed by the group convention, even though only a minority belong to the trade union which has succeeded in bringing about such wage agreement. But if the organized groups are not sufficiently controlling to influence a rate that will serve the majority, they may still constitute such a large factor in the industry as to entitle their scale to be regarded as the prevailing rate; and this would certainly be true if the proportion controlled by such factor constituted as high a number as forty per cent of the total. Finally, if there are no group agreements in the particular locality in relation to wages, or the workers within such agreement compose only a small portion of the working body, an average can be struck between the various rates paid, and such average may constitute the fair market rate or the prevailing rate.

What I have said in connection with the formulation of working rules to carry out the intent of the statute with regard to the prevailing rate of wages, is expressed without the reasoning that underlies it, in article LXVII of the contract, which has been vehemently attacked as an unwarranted modification of the statutory rule and a usurpation of the prerogative of the courts to interpret the enactment. These contentions seem to me unfounded. The statute, as has already been pointed out, imposes a duty upon a public officer charged with the employment of

labor, to inquire what the prevailing rate is, so as to enable him to fix it for the labor he is employing. (*Wright* v. *New York, supra.*) He must discharge this duty reasonably or risk the penalty of losing his office. How shall he proceed to investigate? It is quite true that the determination of the question is one of fact depending upon the circumstances, but it nevertheless hinges upon the application of rules promulgated to make certain that the intent of the law is carried out. Whether these working rules, designed to assure an intelligent application of the statute, are reasonable and secure the result aimed at — the fair determination of what is the prevailing rate — is a matter for the courts ultimately to pass upon in the event a controversy arises. But the responsibility for the adoption of such rules in the first instance rests with the administrative authorities. Nor is it unfair to include the body of workmen already engaged in the work in order to determine the total number of the class as provided in article LXVII. For the purpose of fixing the wage scale at the outset of the work, the prospective body of workmen is naturally not included, because they are not as yet employed upon the work. But as the latter progresses, and fluctuations in the general wage market arise, a review of the established scale may become not only desirable but imperative under the statute. The workmen connected with the operation are a factor in the labor market, and the number so engaged should, therefore, be included in the total.

The further objection that it is unfair in these rules to make "locality" coterminous with the city of New York, because the locality of the work is confined to Fifty-third street between Second and Eighth avenues, is also without merit. The expression "locality" as used here means a political subdivision (*People ex rel. Melledy* v. *Shea*, 73 App. Div. 232), and it is entirely within the spirit of the statute to set its limits as the bounds of the city of New York, in connection with the contract in question. To say that the geographical extension of the term should be limited to sections proximate to the street in which the work is actually to be performed, is to disregard the well-known fact that labor is mobile and does not necessarily dwell in the immediate vicinity of the operation. The very improvement for which this contract was entered into is predicated upon the necessity of travel to and from work and the need of furnishing adequate transportation facilities to the public. I am, therefore, of the view that the rules by which the prevailing rate of wages are to be determined, as laid down in article LXVII, are not in contravention of the statute and are not a usurpation by the administrative authorities of judicial prerogatives, but are a wholesome aid in the effort to achieve a proper result.

In the discussion thus far presented I have paid no attention to the distinction between labor employed by the State directly and such as is hired by an independent contractor, the reason being that attempts at such differentiation made in the earlier cases have been swept away entirely by the later decisions. Thus, in *People* v. *Crane* (214 N. Y. 154; affd., 239 U. S. 195), in the opinion of the court written by Judge CARDOZO, this fact is emphasized as follows (at p. 166): " I do not ignore what was said in *People* v. *Orange County Road Construction Co.* (175 N. Y. 84). There is a suggestion in that case, but not a ruling, that a distinction exists between employees of the state and those of a contractor in respect of the state's power to regulate hours of labor. The later case of *Atkin* v. *Kansas* (191 U. S. 207) has obliterated the distinction, and so it was conceded in *People ex rel. Cossey* v. *Grout* (179 N. Y. 417). It is now perceived that all persons engaged on the public works, from the highest officers to the lowest laborers, through all the gradations of contractors and subcontractors, are, in a very vital sense, in the service of the state. The state has a legitimate· concern in the selection of the men to be employed from one extreme of the official hierarchy to the other. Whether they are called officers or employees does not matter. The power of the legislature depends upon the substance of things, and not upon names and labels." And in a concurring opinion, Judge SEABURY said (p. 185): " In the assertion by the state of its right to control the manner in which public work shall be constructed, it is immaterial whether the public work is done directly by the state or by a municipality or independent contractor. (*Atkin* v. *Kansas*, 191 U. S. 207; *Ellis* v. *United States*, 206 U. S. 246; *People ex rel. Cossey* v. *Grout*, 179 N. Y. 417.) "

The wage scale adopted by the contractor doing public work may, therefore, properly be subjected to the same rules of application within the general principle of the statute, as are employed by the authorities in fixing wages of labor directly employed. If such rules are reasonable, as they appear to be in the instant case, their formulation in advance surely tends to avoid considerable uncertainty. The contention advanced by the plaintiff that they add to the speculative elements in the bidding and, therefore, raise the cost of the undertaking, is not at all convincing. In· thus arguing, he assumes, without, indeed, conceding the fact, that the provision of the statute is constitutional, but urges that the working rules in the contract introduce features of uncertainty not involved in the statute itself. Quite the contrary seems to be the fact. The guiding rules must be much more specific than the basic statute which they amplify. The position implied in plaintiff's argument

that bidding by the contractor with the general language of the statute in mind, is more definite and certain than under the formulated rules, is obviously disingenuous. True it is that not even these rules, and for that matter, any other rules that might be devised, could entirely eliminate the speculative elements in the bidding. In the very nature of the undertaking every contractor must speculate as to the commodity rates, wage rates and unexpected difficulties to be encountered in the progress of the work. If anything, the rules laid down in the contract represent an endeavor to eliminate some of the uncertainties. It is true that affidavits are submitted to indicate that the bidding has been made more uncertain by reason of the so-called modifications contained in article LXVII; but they present conclusions rather than facts and cannot, therefore, be of convincing or probative value.

Still, the plaintiff argues that the clause in article LXVII, which provides that questions arising thereunder shall be determined by arbitration, is onerous and imposes additional expense upon the contractor, which must enter in raising the amount of the bid and thus increasing the public expense of the work. The insertion of the clause is clearly intended to expedite the work and to save the delays incidental to a resort to the courts. The various arbitration proceedings authorized in the Rapid Transit Act were in large measure prompted by the necessity of avoiding undue delay and expense in work of such urgent public character. The plaintiff assumes that this arbitration clause is illegal because, in effect, it provides for adjustment in respect to a matter which the Legislature has determined to be a crime. This reasoning undoubtedly is fallacious. The arbitration clause gives the contractor, among other things, the right to be represented in the exposition of the facts necessary to determine whether the prevailing rate of wages is being paid by him in accordance with the rules in the contract, and whether the conditions have so changed since the establishment of the earlier rates as to justify the adoption of a new scale. Resort to the courts in such matters in the first instance might cause endless delay and consequential injury, and the inclusion of the clause is certainly of public advantage. As the question need not be determined here, I do not presume to decide whether or not, in view of the *Connally* case, the determination of the arbitration board and its subsequent disobedience by the contractor, can be made the basis of criminal prosecution. But even the possible elimination of its criminal provisions does not necessarily render section 220 ineffectual. In any event, a violation of the terms of the agreement by the contractor will constitute a breach on his part and subject him to all the civil penalties consequent upon the

breach of an entire contract under the common law. An interesting commentary upon that branch of the subject is found in the opinion of Chief Judge CULLEN in *People ex rel. Cossey* v. *Grout* (179 N. Y. 417). That was a case in which a contractor, who had built six scows and delivered them to the city, sought to compel payment for them. The city resisted, claiming that the contractor had violated the eight-hour clause of the Labor Law. In deciding in his favor on the ground that this provision was an unconstitutional interference of the Legislature with the right of the municipality — a doctrine superseded shortly thereafter by constitutional amendment — Chief Judge CULLEN nevertheless clearly indicated that if the statute had been valid, the forfeiture clauses of the contract would to all intents be nothing more than a mere application of the common-law rule; holding that a party who has breached a material condition of an entire contract is estopped from maintaining an action thereon. His utterance is as follows (p. 425): " I fear that the many outrages of labor organizations or of some of their members have not only excited just indignation, but at times have frightened courts into plain legal inconsistencies and into the annunciation of doctrines which, if asserted in litigations arising under any other subject than labor legislation, would meet scant courtesy or consideration. The notion that a contractor can acquire any title or right to the compensation stipulated by the contract to be paid to him except on compliance with the terms and conditions upon which it was agreed to be paid, and may successfully assert that though he has intentionally violated his contract he is still entitled to his compensation, seems to me one of those fallacies that would never gain currency save in labor litigations. If the contract into which the relator entered with the city had not been invalid, because of want of power in the legislature to prescribe that character of contracts for municipalities, on what basis would the relator's claim rest? The city never agreed to pay him the stipulated price absolutely and unqualifiedly for the boats furnished, but only on condition that he should work his laborers thereon only eight hours, and to this qualification or condition he expressly agreed. Had the Labor Law otherwise been constitutional, what possible ground of complaint had he? He was to be paid, not for doing the work only, but for doing it in a particular manner, and the contract was entire. *Who ever heard before this a claim that the forfeiture of the value of work done or materials furnished under an entire contract by the failure of the obligor to completely perform it was an unconstitutional confiscation of property?* Look at the elementary law of this state. * * *

" It is finally suggested that the relator did not voluntarily assent to the obnoxious terms of his contract, but was compelled to do so. Let us return to the hypothetical case of an insurance policy. Suppose the plaintiff, in an action on the policy, in answer to the defense of breach of warranty, contended that the deceased protested against making statements as to the cause of the death of his stepmother, of which he may have been ignorant, but was compelled to do so by the company's refusal otherwise to issue the policy. No one will deny that such a claim would be too frivolous to be listened to. The claim of the relator in this respect is exactly the same, and the answer to both is that no man has a right either to an insurance policy or to a contract for work except on just such terms and conditions as the other contracting party prescribes. If one does not like the terms of an insurance policy or of a contract, his remedy is not to accept it." (Italics mine.)

Finally, there remains to be considered the fundamental objection that the statute of 1906 re-enacting the identical provisions of the law of 1897 failed to meet the constitutional objections raised against it in the *Rodgers Case (supra)*, and still carries the very same infirmities. This point which would make the constitutional amendment of 1905 utterly meaningless, was disposed of by Judge VANN, writing for the court, in *People ex rel. Williams Engineering & Contracting Company* v. *Metz* (193 N. Y. 148, 158) in this manner: " We had held that the legislature had no power to pass the Labor Law of 1897 and the amendment was designed to authorize a law of that kind. The legislature acted under the amendment and re-enacted the precise law the overthrow of which by the courts made the amendment necessary. Those provisions of the Constitution which were violated by the Labor Law of 1897 were not violated by the Labor Law of 1906, so far as we are now treating it, because in the meantime the Constitution had been so amended as to modify said provisions by authorizing the legislature to regulate and fix the hours of labor upon public work. Unless the amendment did this it did nothing, and the Constitution is the same in effect as it was before. The presumption is that the people in exercising their supreme power did not do a vain act, but effected a definite purpose."

True it is that these comments were occasioned by an attack upon the constitutionality of the eight-hour provision alone. But if the reasoning in support of them is sound, which apparently no one may gainsay, it is equally appropriate to the prevailing rate feature; and moreover, there is no significance in the refusal of the court in that case specifically to pass upon its validity. The earlier *Ryan* case squarely decided that the prevailing rate stat-

ute, where the State was the direct employer, was constitutional. The later case of *People* v. *Crane,* in respect to the scope of the statute, annulled the distinction between labor hired directly by the public authorities and such as was employed by a contractor working for the State or municipality. May it not be said, therefore, that the highest court of the State, in effect, passed upon the constitutionality of the statute as it relates to the subject with which we are dealing? At the same time it is urged that the highest court of the land by citing the *Rodgers* case in the *Connally* decision, has countenanced all that was said there and thus practically nullified all that was subsequently achieved by the constitutional amendment and the judicial decisions. Such a sweeping and destructive inference does not seem to me to be at all justified. The reference there to the *Rodgers* case is limited to an approval of what was said merely about the difficulty of enforcing the penal provisions by reason of uncertainty. That the Court of Appeals has entertained no doubts as to the enforcibility of the statute as an administrative measure appears to be amply borne out by what has been here presented from the *Ryan, Wright* and *McNulty* cases.

Hence my conclusion is that section 220, subdivision 3, of the Labor Law is constitutional and the insertion of its provisions commanding the payment of the prevailing rate of wages is not only proper but mandatory, and for a violation a civil remedy may be invoked by the city, with a possible criminal prosecution in behalf of the State. As is so aptly said by the Court of Appeals: " It is not unusual in repressive legislation to provide one remedy by civil action to redress the wrong done to the person or corporation injured, and another by criminal prosecution to redress the wrong done to the state and to vindicate its dignity." (*People ex rel. Williams Engineering & Contracting Company* v. *Metz,* 194 N. Y. 145, 147.) I further conclude that article LXVII is clearly within the intendment of the statute, and even if it be deemed a modification of the proposed contract as considered at the statutory public hearing provided for under section 37, subdivision 2, of the Rapid Transit Act (Laws of 1891, chap. 4, as added by Laws of 1894, chap. 752, and amd. by Laws of 1917, chap. 625), it is nevertheless authorized by that very statute which, in part, provides that: " The commission may, after the hearing to be held * * * alter, modify or amend such draft contract in any manner in its discretion."

The motion for an injunction *pendente lite* must, therefore, be denied, and the motion to dismiss the complaint on the ground that it does not state facts sufficient to constitute a cause of action must be granted. Orders signed.