[L. A. No. 13498. In Bank.—April 18, 1932.]

THE METROPOLITAN WATER DISTRICT OF SOUTHERN CALIFORNIA (a Public Corporation), Petitioner, v. W. P. WHITSETT, as Chairman, etc., Respondent.

James H. Howard, Ray W. Bruce and Alan Patten for Petitioner.

S. M. Haskins, Arthur M. Ellis and Gibson, Dunn & Crutcher, as *Amici Curiae* for Petitioner.

Robert H. Dunlap and George R. Larwill for Respondent.

Everett W. Mattoon, County Counsel (Los Angeles County), Ray C. McAllaster, Deputy County Counsel, Earl Warren, District Attorney (Alameda County), Glen M. De Vore, District Attorney (Fresno County), James C. Hollingsworth, District Attorney (Ventura County), Percy C. Heckendorf, District Attorney (Santa Barbara County), Thomas Whelan, District Attorney (San Diego County), Earl Redwine, District Attorney (Riverside County), Fred L. Thomas, District Attorney (Santa Clara County), James F. Hoey, District Attorney (Contra Costa County), H. Ray Bailey, District Attorney (Kern County), Mason A. Bailey, District Attorney (Madera County), Henry E. Greer, District Attorney (Marin County), F. M. Ostrander, District Attorney (Merced County), Edmund Scott, District Attorney (San Mateo County), as *Amici Curiae* for Respondent.

SHENK, J.—This is an application for a writ of mandate to compel the respondent, as chairman of the board of

directors of the petitioner district, to sign a contract for the construction of Entrance Hill Road, located in Riverside County, and to be used in conjunction with the Colorado River aqueduct.

After notice inviting proposals, the contract was duly awarded to Martin Bros. Trucking Company. The particular work to be performed is the construction of about 6.45 miles of graded road, involving approximately 44,000 cubic yards of excavation, with appurtenant metal pipe culverts, concrete protection walls and related work.

The respondent has refused to sign the contract because the petitioner did not ascertain, and specify in its notice inviting proposals and insert in the contract, the general prevailing rate of *per diem* wages in the locality in which the work is to be performed for each craft or type of workman or mechanic needed to execute the contract, as required by the provisions of an act passed by the legislature and approved by the Governor in 1931. (Stats. 1931, p. 910.) This enactment is referred to as the Public Wage Rate Act of 1931.

Section 1 of the act provides: "Not less than the general prevailing rate of *per diem* wages for work of a similar character in the locality in which the work is performed . . . shall be paid all laborers, workmen and mechanics employed by or on behalf of the state of California, or by or on behalf of any county, city and county, city, town, district or other political subdivision of the said state, engaged in the construction of public works, exclusive of maintenance work. Laborers, workmen and mechanics employed by contractors or subcontractors in the execution of any contract or contracts for public works . . . shall be deemed to be employed on public works."

Section 2 provides: "The public body awarding any contract for public work . . . shall ascertain the general prevailing rate of *per diem* wages in the locality in which the work is to be performed, for each craft or type of workman or mechanic needed to execute the contract, and shall specify in the call for bids for said contract, and in the contract itself, what the general prevailing rate of *per diem* wages in the said locality is for each craft or type of workman needed to execute the contract, . . . and it shall be mandatory upon the contractor to whom the contract is awarded, and upon

any subcontractor under him, to pay not less than the said specified rates to all laborers, workmen and mechanics employed by them in the execution of the contract. The contractor shall forfeit as a penalty to the state or political subdivision, district or municipality on whose behalf the contract is made or awarded, ten dollars per day for each laborer, workman or mechanic employed, for each calendar day, or portion thereof, such laborer, workman or mechanic is paid less than the said stipulated rate for any work done under said contract, and the said public body awarding the contract shall cause to be inserted in 'the contract a stipulation to that effect. It shall be the duty of such public body awarding the contract, and its officers and agents, to take cognizance of complaints of all violations of the provisions of the act, . . . and, when making payments to the contractor of moneys becoming due under said contract, to withhold and retain therefrom all sums and amounts which shall have been forfeited pursuant to the herein said stipulation and the terms of this act; provided, however, that no sum shall be withheld, retained or forfeited, except from the final payment, without a full investigation by either the division of labor statistics and law enforcement of the state department of industrial relations or by said awarding body . . . "

Section 3 provides: "The contractor and each subcontractor shall keep, or cause to be kept, an accurate record showing the names and occupations of all laborers, workmen and mechanics employed by him, in connection with the said public work, and showing also the actual *per diem* wages paid to each of said workers, which record shall be open at all reasonable hours to the inspection of the public body awarding the contract, its officers and agents, and to the chief of the division of labor statistics and law enforcement of the state department of industrial relations, his deputies and agents."

Section 4 provides: "Construction work done for irrigation, utility, reclamation, improvement and other districts, or other public agency, agencies, public officer or body . . . shall be held to be public works within the meaning of this act. The term 'locality in which the work is performed' shall be held to mean the city and county, county or counties in which the building, highway, roads, excavation, or other

structure, project, development or improvement is situated in all cases in which the contract is awarded by the state, or any public body thereof, and shall be held to mean the limits of the county, city and county, city, town, township, district or other political subdivision on whose behalf the contract is awarded in all other cases. The term 'general prevailing rate of *per diem* wages' shall be the rate determined upon as such rate by the public body awarding the contract, or authorizing the work, whose decision shall be final . . . ''

Section 5 provides: "Any officer, agent or representative of the state of California, or of any political subdivision, district or municipality thereof, who willfully shall violate, or omit to comply with, any of the provisions of the act, and any contractor or subcontractors, or agent or representative thereof, doing public work as aforesaid, who shall neglect to keep, or cause to be kept, an accurate record of all of the names, occupations and actual wages paid to each laborer, workman and mechanic employed by him, in connection with the said public work, or who shall refuse to allow access to same at any reasonable hour to any person authorized to inspect same under this act, shall be guilty of a misdemeanor . . . '' and be punishable as such.

It is contended by the petitioner (1) that said act is void for uncertainty; (2) that the burden thus attempted to be imposed upon the petitioners is in violation of section 12 of article XI of the state Constitution; and (3) that the act makes an invalid delegation of legislative power. The points will be determined in the order above named, with some preliminary discussion as to the status of the petitioner district and the purposes of the act.

The petitioner, Metropolitan Water District of Southern California, is a public corporation, organized and existing under the "Metropolitan Water District Act". (Stats. 1927, p. 694.) The purpose of its organization was to acquire the right to and to conduct waters from the Colorado River for distribution to the municipalities within and a part of the district for domestic and other useful purposes. The cities within the district are numerous, some organized and existing under freeholders' charters and some under general law. The district has broad powers in connection with the object of its creation, including the power, by vote of the

electors in the district, to issue and sell bonds; to levy and collect general taxes within the participating municipalities; to acquire water and other rights and property; to perform construction work; ''to enter into contracts, to employ and retain personal services . . . and employ laborers''; and generally to do and perform all things necessary to carry out the purposes of the district under the act. The governing body of the district is a board of directors, consisting of at least one representative from each municipality, the area of which shall lie within the district. The validity of the act was approved by this court in *City of Pasadena* v. *Chamberlain,* 204 Cal. 653 [269 Pac. 630]. ▉ It was therein declared that notwithstanding the rights and powers of the freeholders' charter cities within the district, under section 6 of article XI of the Constitution, the general purposes and objects to be subserved by the organization of a district under the act are not municipal affairs. Following its organization the electors thereof, at an election duly held for that purpose, approved a bond issue of upwards of \$220,000,000, and the district is now proceeding to carry out its objects and purposes by the letting of contracts for public work, one of which is the particular contract in question.

▉ Under the law the petitioner finds itself a public instrumentality of legislative creation whose powers and duties may be enlarged, restricted or abolished at the will of the legislature, which possesses all the powers of the sovereign not expressly withheld by the Constitution. Except as restricted by the Constitution, the legislature has absolute control over this corporation and its affairs. The legislative power of regulation and control over the affairs of the district includes the power to prescribe the conditions under which the state will permit public work to be done. It is immaterial whether the state undertakes the work itself or has invested one of its governmental agencies or instrumentalities with power to do it. (*Atkin* v. *Kansas,* 191 U. S. 207 [48 L. Ed. 148, 24 Sup. Ct. Rep. 124]; *Heim* v. *McCall,* 239 U. S. 175 [Ann. Cas. 1917B, 287, 60 L. Ed. 206, 36 Sup. Ct. Rep. 78].) Indeed, it is fairly conceded by the petitioner that the district is subject to the control of legislative enactments within constitutional limitations. We

then pass to a consideration of the several claims that the act under attack is unconstitutional and void.

█ It is first asserted that the enactment is void for uncertainty (a) in that the phrase "general prevailing rate of *per diem* wages" is not and cannot be stated as a definite amount, (b) in that the phrase "work of a similar character" is too vague to permit definition and (c) in that the phrase "in the locality in which the work is performed" is in itself uncertain and is rendered less certain by the attempt made in the act to define it. It is therefore argued that, in view of the penal provisions of the act, neither the officers of the district nor the contractors with the district may know in advance with sufficient certainty whether any act performed by them is in contravention of the statute. █ In this connection it is of prime importance to note what is required by the act, the nonperformance with which or the omission to do which is made a penal offense. As applied to officers of the district, it is made a misdemeanor for any officer or agent of the district wilfully to violate or omit to comply with the requirements of the act. When we point to duties imposed upon such officers and agents we find that they are required to ascertain the "general prevailing rate of *per diem* wages in the locality in which the work is to be performed, for each craft or type of workman needed to execute the contract". The "general prevailing rate of *per diem* wages" is defined to be the rate determined upon by the public body awarding the contract and the decision of such body is made final and conclusive. When the board of directors, as in this case, has made its decision on this matter, it has performed its duty in the premises, and it must be presumed that it will perform such duty honestly, fairly and to the best of its ability upon investigation, in good faith, and with due regard to the rights of the workmen to be employed and the taxpayers of the district. When this final decision is made no uncertainty would arise in the requirement that the schedule of rates of wages be inserted in the call for bids and in the contract itself. Nor would any uncertainty be encountered in entertaining complaints as to violations by the contractor of the terms of the contract, nor in determining upon investigation what if any deductions should be made from the final payment to the contractor by reason of such violation. When these

duties are performed the statute has been complied with by the public officers and when performed in good faith no criminal or other liability may be invoked against them.

The duty imposed on the contractor, subcontractor, or agent or representative thereof is that an accurate record be kept of the names, occupations and actual wages paid to each laborer, workman and mechanic employed by him and that access to this record be available at any reasonable hour to the public officer or his representative authorized under the act to inspect the same. There is no uncertainty in the duties thus imposed and an offense against the statute in this regard is clearly defined. There is no efficacy in the contention that the terms of the act relating to criminal liability and penalties are so vague that men of common intelligence must necessarily guess at their meaning and differ as to their application. The petitioner places its main reliance in this connection upon the cases of *Connally* v. *General Const. Co.*, 269 U. S. 385 [70 L. Ed. 322, 46 Sup. Ct. Rep. 126], *State* v. *Garfield Building Co.*, 39 Ariz. ——, 3 Pac. (2d) 983, and *Mayhew* v. *Nelson*, 346 Ill. 381 [178 N. E. 921]. The Connally case involved the validity of a statute of Oklahoma which provided that laborers, workmen, mechanics' etc., on public work should be paid "not less than the current rate of *per diem* wages in the locality in which the work is performed". The duty was placed upon the contract to determine, at the risk of incurring criminal liability and cumulative penalties, both the current rate of wages and the locality in which the work was to be performed. On the record in that case it was disclosed that wages in differing amounts were being paid by contractors for the same kind or class of work in the vicinity of the town of Cleveland, where the work was performed. It was held that the statute presented a double uncertainty, first as to what was the "current rate of wages", and secondly as to the "locality" in which the work was to be performed. To quote the language of the Supreme Court of the United States: "The words 'current rate of wages' do not denote a specific or definite sum, but minimum, maximum, and intermediate amounts, indeterminately, varying from time to time, and dependent upon the class and amount of work done, the efficacy of the workman, etc., as the bill alleges is the case in respect to the territory surrounding the

bridges under construction. The statutory phrase reasonably cannot be confined to any of these amounts, since it imports each and all of them. The 'current rate of wages' is not simple, but progressive—from so much (the minimum) to so much (the maximum), including all between; and to direct the payment of an amount which shall not be less than one of several different amounts, without saying which, is to leave the question of what is meant incapable of any definite answer. . . . To construe the phrase 'current rate of wages' as meaning either the lowest rate or the highest rate or any intermediate rate, or, if it were possible to determine the various factors to be considered, an average of all rates would be as likely to defeat the purpose of the act as to promote it.'' The court also held that the word ''locality'' was too indefinite, elastic and uncertain to satisfy the requirements of a criminal statute.

The case of *State* v. *Garfield Building Co., supra,* involved the validity of a criminal statute of Arizona providing that ''not less than the current rate of *per diem* wages in the locality where the work is performed shall be paid to persons doing manual or mechanical labor so employed by or on behalf of the state or any of its political subdivisions''. The county attorney of Pima County informed against a contractor engaged in the construction and alteration of a public school building on account of his failure and refusal to pay his employees the current rate of wages. The Supreme Court of Arizona followed the ruling in the Connally case and declared the statute unconstitutional on the ground that it was too indefinite and uncertain in its terms to impose a criminal liability on the contractor bound under its terms to determine himself what the current rate of wages was.

In the case of *Mayhew* v. *Nelson,* 346 Ill. 381 [178 N. E. 921], an Illinois statute, effective July 1, 1931, and purporting to regulate the wages of mechanics and laborers employed under contracts for public works, was attacked by a taxpayer who sought to enjoin the execution of a state highway improvement contract on the ground that the statute was vague and uncertain in its terms, incomplete and defective in its provisions, lacking in the means of enforcement and therefore invalid; also that it delegated absolute or unlimited and arbitrary power to administrative officers

and boards, and numerous other grounds not necessary to be noted. The statute is set forth in full in the opinion and is strikingly similar to the California statute in two respects: First, in that every contract in which the state or any political subdivision thereof is a party, with reference to the performance of public·work, shall contain a provision that not less than the prevailing rate of wages for work of a similar nature in the city, town, village, or other civil division of the state in which the public work is located, shall be paid to the laborers and mechanics employed on said work by the contractor or the subcontractor, and that the prevailing rate of wages shall be inserted in the advertisement for bids; and secondly, that the prevailing rate of wages shall be determined by the public body in the case of any contract let. Provision is then made for objection by the taxpayers to the wage schedule thus fixed and a determination of their complaint by the director of labor. An appeal to an appeal board from the determination of the director of labor is then provided for. The appeal board is composed of certain designated public officials and the president of the largest federated body of organized labor in the state, designated by the director of labor. The finding of the appeal board is made "subject to a review by the courts as justice may require". The statute was held invalid on the ground that it prescribed no test or standard by which the prevailing rate of wages in a particular jurisdiction may be ascertained; that no guide is offered by which wage rates may be determined when the work contemplated extends from one subdivision of the state into or through another, and that no mode or method is provided for the determination of appeals to the appeal board or for a review in the courts.

In the Connally case and in the case of *State* v. *Garfield Building Co., supra,* it is observed that the statutes therein involved imposed the duty on the contractor to determine at his peril the current rate of wages, and the locality in which the work was to be performed was not defined. In the California statute the prevailing rate of wages, which must be deemed the same as the current rate of wages, is determined by the public body awarding the contract, and the locality to be considered in fixing the rate of wages is also defined. The statute in the Mayhew case provided, as here,

that the public body awarding the contract should determine the rate and the "locality" was designated. The Illinois court based its decision on its own reasoning and cited as authority for its conclusion two cases in its own jurisdiction and the case of *People ex rel. Rodgers* v. *Coler,* 166 N. Y. 1 [82 Am. St. Rep. 605, 52 L. R. A. 814, 59 N. E. 716], without regard to the fact that the Coler case was distinguished and not followed in the later case of *Ryan* v. *City of New York,* 177 N. Y. 271 [69 N. E. 599], where the New York statute providing for the payment of "not less than the prevailing rate" of wages in the locality, was sustained. The majority of the court in the Coler case held the statute invalid as an invasion of the constitutional rights of the city of New York and as a denial of the liberty of contract on the part of the contractors, and a denial of due process of law when the privilege of hiring labor on any terms obtainable was obstructed or withdrawn. The case was decided in 1901. In 1903 the question of the validity of a Kansas statute prescribing a limit of eight hours of labor per day on public contracts and requiring the payment of the current rate of wages on public work based on private work or a similar character came before the Supreme Court of the United States. In *Atkin* v. *Kansas, supra,* it was decided that the statute was a valid exercise of the power of the state in providing the conditions under which it would permit its public work to be performed. In that case the court said, at page 222: "It cannot be deemed a part of the liberty of any contractor that he be allowed to do public work in any mode he may choose to adopt, without regard to the wishes of the state." It is suggested by counsel that the eight-hour provision of the Kansas statute was the subject of most of the discussion in the opinion, but the "current rate of wages" provision was also involved and was not held invalid. It cannot be assumed that the statute would have been sustained in its entirety if the latter provision had been deemed invalid. The Ryan case in New York then came on in 1904, in which the court of appeals followed the views expressed by the Supreme Court of the United States in the Atkin case. Thereafter the Constitution of New York was amended in 1905 specifically to provide that the legislature should have power to regulate

and fix the wages and hours of labor on public work. This amendment appears to have been necessary in order to meet and overcome the effect of the holding of the court of appeals in the Ryan case that the city of New York was immune from the requirements of the statute. The prevailing wage law and the effect upon it of the constitutional amendment again came before the court of appeals in 1927. (*Campbell* v. *New York City,* 244 N. Y. 317 [155 N. E. 628]; reported and annotated in 50 A. L. R., p. 1473), and the law was upheld as applicable to the city as well as the city's contractors by reason of the constitutional amendment. Notwithstanding the fact that the prevailing wage law of New York (Consol. Laws, chap. 32, sec. 220), provided that the contract for the public work should provide that the contractor should pay the prevailing wage without a predetermination by public authority of the amount thereof and that a violation of the statute should be a misdemeanor, the court in the Campbell case (an injunction suit), concluded that a civil liability might attach even though the Connally case might stand in the way of a criminal prosecution. The New York prevailing wage statute was approved in *Long Island R. Co.* v. *Department of Labor of State of New York,* (1931) 256 N. Y. 498 [177 N. E. 17]. Here we suffer no embarrassment by reason of the claim of uncertainty in the criminal phases of the California statute for the reason that the violations of the act which are made a misdemeanor are definite, certain and unambiguous.

The doctrine of the later New York cases has been followed and approved in the state of Washington (*Malette* v. *City of Spokane,* 77 Wash. 205 [Ann. Cas. 1915D, 225, 51 L. R. A. (N. S.) 686, 137 Pac. 496]), Wisconsin (*Wagner* v. *City of Milwaukee,* 180 Wis. 640 [192 N. W. 994]; writ of error dismissed for want of jurisdiction, 266 U. S. 585 [69 L. Ed. 454, 45 Sup. Ct. Rep. 124]), and Maryland (*Sweeten* v. *State,* 122 Md. 634 [90 Atl. 180]; *Elkan* v. *State,* 122 Md. 642 [90 Atl. 183], affirmed in 239 U. S. 634 [60 L. Ed. 478, 36 Sup. Ct. Rep. 221] on the authority of *Atkin* v. *Kansas, supra; Ruark* v. *International Union,* 157 Md. 576 [146 Atl. 797]).

A review of the many authorities cited by counsel for the parties and by *amici curiae,* too numerous to be commented upon, discloses that the great weight of authority

and the distinct trend of recent judicial decision is in favor of the constitutionality of prevailing wage laws as applied to public work. The Atkin case has never been expressly overruled by the Supreme Court of the United States. It was not referred to in the Connally case; the latter case is not applicable to the case at bar for the reason that here we are not confronted with any uncertainty as to the nature or character of the particular offense that is declared to be a crime. The Arizona case (*State* v. *Garfield Building Co.*, *supra*) is not applicable for the same reason. The Illinois case (*Mayhew* v. *Nelson, supra*) did not discuss or notice the more recent decisions upholding prevailing wage statutes. No doubt it was correctly decided, for there is in that statute a provision not found in our own, an unlawful delegation of authority to determine the current wage by a board composed in part by one not a public officer; and the reference by the court to the Coler case in New York was in reliance upon a case in that state which had long since been repudiated by its highest court.

But, say counsel, what is a prevailing wage? No court has attempted, and properly so, to fix one in a definite amount. Precise definition of the term for all time and place is impossible. The Supreme Court of the United States has pointed out the difficulties of definition and held it too indefinite in a criminal prosecuton. Other courts have indicated perhaps a workable definition as a matter of business administration. Its definition is relative to time and place, both of which are within the purview and cognizance of the administrative board in each case. In the Ruark case, 157 Md. 576 [146 Atl. 797], the court of appeals of Maryland said, at page 801: "The clause, 'the current rate of *per diem* wages in the locality where the work is performed', may therefore be held to mean the charge for the valuation of the daily toil of a laborer, workman or mechanic, as the case may be, at a given labor, according to a scale or standard of money compensation then generally received or established by common consent or estimation throughout an area which includes, not only the actual site where the public work is to be performed, but also such adjoining territory within which the compensation does prevail. The construction adopted will assure the fulfillment of the legislative intention without being violative

of any constitutional right or rule of law. In short, labor has its market value (citing cases). The determination of this value is a familiar problem in a suit on a *quantum meruit* for work and labor; and its solution is by testimony establishing the usual price for like services at the time and place of performance. . . . It is common knowledge that every contractor undertakes a public work upon the basis of the then cost of labor at the place of performance. The labor cost is usually the principal item of construction. So it is not unreasonable to impute to a contractor the knowledge which the nature of his business, and its prosecution, required him to possess, or which might have been obtained by reasonable investigation.''

In the Campbell case (244 N. Y. 317 [50 A. L. R. 1473, 155 N. E. 628, 631]) the court of appeals of New York said: ''This is not the time to attempt a definition of 'prevailing rate of wages' with its background of legislative history and twenty years or more of practical construction. We find it hard to believe that a cliché so inveterate is devoid of meaning altogether. Learned judges have said (citing Haight, J., in the Coler case), that it is synonymous with market value. This might not exclude altogether the possibility of fluctuations and diversities of a given day and place. There can be little doubt that it would furnish us with criteria of conduct adequate for civil, if not for criminal, liability.'' In *Morse* v. *Delaney*, 128 Misc. Rep. 317 [218 N. Y. Supp. 571, 576], after reviewing certain cases on the subject, the court concluded: ''We thus have a range of opinion which, while varying in expression, substantially points, with but one exception, to an interpretation of the 'prevailing rate' as the 'fair market value'.'' It is for the board of directors to ascertain that value as it would the value of any other services of which the district might be in need. When it has done so, that which may have been subject to variation has become definite by the action of constituted authority.

The contention that the phrase ''work of a similar character'' is too vague to permit definition would seem to be without substantial merit. The character of the work to be performed on the proposed road or on any of the construction work to be done by the district in carrying out the object of its creation would not appear to be so extra-

ordinary as not to permit a ready classification of the employees by resort to means of common knowledge and experience in this state. The law was intended for the benefit of the great body of laborers and mechanics to be employed on the job. There would seem to be no difficulty in classifying such employees as blacksmiths, bricklayers, carpenters, concrete mixer operators, crane operators, hod carriers, iron workers—structural, reinforcing and ornamental—laborers, lathers, marble workers, mechanics, painters, pile driver men, plasterers, powder men, traction operators, truck drivers, teamsters, etc. The mention of the foregoing does not, of course, exclude others, but the classification would necessarily include those workers who, by common experience, are numerous enough that a prevailing wage may be applied to them. Just why the phrase is too vague is not specifically pointed out. The fact that the phrase is used in most of the statutes which have come to our attention and been complied with without the necessity of judicial decision on the subject is persuasive that it is not subject to the objection raised.

█ Nor do we find the phrase ''locality in which the work is performed'' to be so uncertain as to justify noncompliance with the act. As applicable to the petitioner it must be conceded that the definition is somewhat ambiguous. As so applicable it is defined to be the city and county, county, or counties in which the improvement is to be constructed in all cases in which the contract is awarded by the state, or any public body thereof, and the limits of any city, county, city and county, town, township, district or other political subdivision on whose behalf the contract is awarded in all other cases. It is at once apparent that the petitioner is a public body of the state as indicated in the first portion of the definition and it is also a district as indicated in the latter portion. The intention is plain to fix the locality where the work is to be performed. When the work is to be done partly in city and partly in county territory, or in adjoining cities or in different counties, administration of the act in this respect may become complicated and of difficult performance, but if it can be done with reasonable certainty no judicial question is presented. It is a burden placed upon the petitioner by the authority of its creation

which is all embracing and all powerful in its exactions, subject only to constitutional restraints.

The next point made in support of the petition is that the burden imposed by the statute on the petitioner is in violation of section 12 of article XI of the Constitution which provides that "the legislature shall have no power to impose taxes upon counties, cities, towns or other public or municipal corporations, or upon the inhabitants of property thereof, for county, city, town or other municipal purposes, but may, by general laws, vest in the corporate authorities thereof, the power to assess and collect taxes for such purposes". It is argued that "the burden of increased cost of the public works of such district, which is bound to be caused by compliance with the prevailing wage act, is the imposition of a tax on the inhabitants and property of the district and is expressly prohibited by this section of the Constitution." The difficulty with the argument is that it assumes that the burden imposed by the statute is a tax. If it is not, the argument necessarily fails. In our opinion the burden imposed by the statute is not a tax as contemplated by the Constitution. It is essentially a Minimum Wage Law. When the schedule of wages is determined, not less than the amounts specified therein may be paid to employees on the work. The act provides that nothing therein shall be construed to prohibit the payment to any employee on the public work more than the prevailing rate.

Minimum wage statutes applicable to public work have been uniformly upheld on the theory that the state as the employer having full control of the terms and conditions under which it will contract may, through its legislatures, and within constitutional limits, provide the wage which shall be paid to its employees and that the payment of a less sum shall be unlawful. In 1897, the legislature of the state enacted a statute prescribing two dollars per day as a minimum wage to be paid for labor on public works. (Stats. 1897, p. 90.) This wage may or may not have been more than the prevailing wage for labor in similar employment of that day. Apparently the validity of that statute has never been questioned, and the act was repealed in 1931. (Stats. 1931, p. 909.) Under all of the authorities cited, or which have come to our notice,

it is uniformly held that the legislature itself, unless constitutionally restrained, may fix in a definite amount the minimum wage for labor on public work. Whether it may delegate authority to fix such wage to a subordinate public body subject to its control will be considered. ▮ The fact that the minimum wage prescribed, whether by the legislature itself or by a public body under its direction, may increase the cost of the work is not sufficient to characterize the exaction a tax within the meaning of the Constitution. Rather, it is one of the terms and conditions upon which the legislature, exercising its lawful power, has seen fit to impose on one of its subordinate creatures, and the fact that compliance therewith may increase the cost of the work is not a matter of which the district may complain. The same argument has been advanced in attacks upon public work eight-hour laws, but such contentions have been set at rest since the decision in *Atkin* v. *Kansas, supra.* Minimum wage statutes on public work have been upheld in New York, Iowa, Washington, Colorado, Oklahoma, Maryland and Wisconsin and have been sustained by the highest court in the land. The power of the state in this respect was recognized by the Supreme Court of Arizona and the Supreme Court of Illinois did not deny it. The controversies that have arisen were focused on the method of prescribing them rather than on the power to enact them.

▮ We now pass to the contention that the statute unlawfully delegates legislative power to the board of directors of the district. The petitioner concedes that the object to be accomplished may be directed by the legislature to be carried into effect by subordinate officers and bodies having better opportunities for accomplishing the object, or doing the thing understandingly, and that the legislature may delegate the power to determine some fact or state of things upon which the law makes, or intends to make, its own action depend; but it is contended that the statute under attack in effect attempts to delegate to the board of directors the power to make the law, which involves a discretion as to what the law shall be, as distinguished from the power to exercise a discretion under and in pursuance of the law. It is argued that power to do the former may not, but power to do the latter, may be delegated. Abstractly, the distinction drawn by counsel is correct. The

question is, Has the statute delegated to the board power to make law? When we look to the act creating the petitioner, we find very broad powers conferred on the board of directors. The board is granted the power among other things to make and pass ordinances, resolutions and orders not repugnant to the state and federal Constitutions, or the provisions of the act, and is specially granted the power to establish and fix the powers and duties and compensation of the officers and employees of the district. Unless the power thus granted to fix the salary or wages of its own employees is an unlawful delegation of power to the board, and we do not intimate that it is, or that it would be conceded by the petitioner to be unlawful, the power granted by the statute under attack to fix a minimum wage for the employees of contractors with the district would not be an unlawful delegation. The difficulty urged is one of administration, that is, in fixing the minimum. While it would be within the power of the legislature to fix in the statute a minimum in dollars and cents for the various classes of employees on public work, it would be manifestly impracticable thus to establish a scale of wages which would be fair to the state and its agencies and also to the employees affected and to remain inflexible over a period of years. If the power of the legislature to delegate the determination of this and the many other problems of administration to subordinate bodies be denied, public work might be unreasonably curtailed or brought to a standstill. (*Mutual Film Corp.* v. *Industrial Com.*, 236 U. S. 230 [Ann. Cas. 1916C, 296, 59 L. Ed. 552, 35 Sup. Ct. Rep. 387].)

 It is unnecessary to cite cases to the effect that it has become a firmly established rule of law that a large measure of discretion may be delegated to administrative officers and boards. Here the determination of the board of directors is made final. This does not mean that the action of the board may be arbitrary or capricious, but the proper administration of the statute will be presumed. Difficulties in such administration are presented by way of argument, but they do not present judicial questions. It is frankly conceded by counsel for the petitioner that because the law is difficult of application and might in some circumstances work hardship, it is not, of necessity, invalid.

Whatever difficulties confront the petitioner in the application of the law have been imposed upon it by the legislature, the power of its creation. It is not for the courts to say that the legislature should not have so acted in a matter of so great concern. In this connection we quote the language of Mr. Justice Harlan, speaking for the court in the Atkin case (191 U. S. 207, at page 223 [48 L. Ed. 148, 24 Sup. Ct. Rep. 124, 128]) : "So, also, if it be said that a statute like the one before us is mischievous in its tendencies, the answer it that the responsibility there for rests upon legislators, not upon courts. No evils arising from such legislation could be more far-reaching than those that might come to our system of government if the judiciary, abandoning the sphere assigned to it by the fundamental law, should enter the domain of legislation and upon grounds merely of justice or reason or wisdom, annul statutes that had received the sanction of the people's representatives. We are reminded by counsel that it is the solemn duty of the courts in cases before them to guard the constitutional rights of the citizens against merely arbitrary power. That is unquestionably true. But it is equally true—indeed, the public interests imperatively demand—that legislative enactments should be recognized and enforced by the courts as embodying the will of the people, unless they are, plainly and palpably, beyond all question in violation of the fundamental law of the Constitution." If the statute under attack in its operation shall become too burdensome upon public agencies over which the statute is controlling the remedy is at the hands of the legislature and not through the courts.

The peremptory writ is denied.

Waste, C. J., Seawell, J., Curtis, J., Langdon, J., Preston, J., and Tyler, J., *pro tem.*, concurred.